157 So.2d 38

James E. LEWIS

v.

STATE.

3 Div. 126.

Court of Appeals of Alabama.

Oct. 15, 1963.

———◆———

Windell C. Owens, Monroeville, for appellant.

Richmond M. Flowers, Atty. Gen., and Peter M. Lind, Sp. Asst. Atty. Gen., for the State.

JOHNSON, Judge.

After the overruling of his motion for a new trial, James E. Lewis appeals from a conviction for the second degree murder of James Albert Cole, for which he was sentenced in the Circuit Court of Conecuh County to a term of ten years in the State penitentiary.

The twenty-one year old appellant was on leave from the United States Army visiting at the home of his father, Alfred Lewis, in Range, Alabama, on Saturday, May 12, 1962. On that Saturday afternoon the now deceased, James Cole, drove up to the front of the Lewis home and persuaded the appellant to ride with him to Deer Range. The Lewis home was situated next to the last dwelling on a dirt road which ended at Cole's home where Cole apparently lived alone. Beyond the end of the road was a branch and beyond that, other homes.

The Lewis family had lived at this location from the time the appellant was a child but Cole, who was fifty-two years old, had moved into his home after appellant had joined the Army at the age of eighteen. It appears that appellant and the deceased were only casual acquaintances at the time of this incident.

Appellant got into Cole's 1955 Ford at about 8:00 P.M. His testimony at this point is as follows:

"When I got in the car with Mr. Cole he had two pints of moonshine whiskey in there with him and I took a couple of drinks with him going onto Deer Range and we stopped there in front of Mr. Miles Jackson's store and was standing there drinking, well that's the last thing I remember—and he asked me did I want to go to Brewton with him and I told him no, and we was standing there talking and drinking all at the same time and I just blacked out or something another and I woke up at his house about twelve o'clock."

Appellant further testified that he did not remember going to Brewton or that a third person accompanied them. Jerome Sawyer testified that he saw appellant in Brewton that night with James Cole and another person and that appellant waved to him from the front seat of the 1955 Ford.

Appellant recalls awakening around midnight in Cole's house where the two were sitting at Cole's "eating table" on which was a bottle of moonshine whiskey. Appellant further testified that he had not drunk much moonshine whiskey prior to this incident and that:

"Well, we set there and talked a long time and I got up and told him I was going home and he wanted me to spend the night with him and I told him I would go on up to the house, and we got to arguing around there and he pulled a knife out, I don't know whether he intended to cut me with it or anything but he had it in his hand and I asked him what was he going to do with the knife and he didn't say nothing and I got up and started off and when I got up and started off he started towards me, and I hit him but I didn't even hit him hard enough to knock him down, and when I hit him I grabbed his hand and twisted the knife out of his hand."

Appellant testified that he put Cole's knife in his pocket and made no further effort to hit him and that they:

"Went out to his car and he said there was something the matter with the starter on it and asked me did I know how to fix it and I told him I'd try to. And I was up under the car trying to work on it and I got out and I was setting in the car under the steering wheel and he was setting out on the ground talking to me and that's the last thing I remember till I woke up the next morning."

Additional questioning by his attorney brought out that the appellant remembered that Cole went back into the house to get a flashlight while appellant was under the car and that after getting under the steering wheel Cole had another drink, and that he

still had Cole's knife in his pocket while Cole was sitting on the ground. They did not fight in the yard.

Appellant continued to testify:

"Well, it was just coming daylight and I woke up and I thought he was laying there asleep, he kind of had his head turned side ways, I didn't pay much attention to him and I reached back like that and started to get up and I felt something under my hand and I looked and my wallet was there on the seat and I looked in it and all the money was gone [five $20.00 bills, one $5.00 bill, and three $1.00 bills] and I just taken it and stuck it in my pocket."

Appellant testified that there was another wallet lying there but that he left it alone and then walked to his father's house by the shortest route, going down the road and through a field, which took about ten or fifteen minutes. When he got to his father's house, Lewis was still drunk and went into a room where he changed clothes. His father came in and he heard him say something about going to get some eggs.

The father, Alfred Lewis, testified that his son came home wearing civilian clothes at about 4:00 A.M. when he was feeding the hogs and that at about 6:00 A.M. he drove his truck to Cole's to get some eggs, which is where he normally bought his eggs. When he got there, he found Cole dead.

Upon discovering the body, Alfred Lewis had his brother call Sheriff Brock. Later, Alfred Lewis told the sheriff that "they said my boy was with him [James Albert Cole]", which caused the sheriff to suspect the appellant.

Sheriff Brock testified to details indicating that there had been a fight in the house and in the yard and signs of heavy drinking in the area. State Toxicologist Nelson Grubbs, who performed an autopsy on the deceased, testified that in his opinion Cole died from being strangled by fingers which crushed his voice box causing his lungs to fill up with blood. In addition to the evidence of strangulation, Grubbs testified that he found several abrasions on the body and that the nose and facial bones were crushed and that four ribs were fractured. He testified that it was impossible to determine the time of death.

William B. Thomas, criminal investigator for the Army at Fort Rucker, Alabama, testified as a witness for the State concerning a voluntary statement taken by him from the defendant on or about May 17, 1962, in the presence of Sheriff Brock as follows:

"He said that Mr. Cole picked him up on the night of the twelfth of May and that they went for a ride and had a few beers and came back by his house which was not too far from Mr. Cole's house and that Mr. Cole insisted that he go on down to his home and have a few drinks and watch T.V. They did this in the living room of Mr. Cole's home and had a few drinks and watched T.V. till about one o'clock and he decided he'd have to go home. And he got up to go home and he asked Mr. Cole to take him home and Mr. Cole seemed to get mad and slapped him in the face and at this time he said he hit Mr. Cole and knocked him to the floor. * * * And that he went on out after this happened in the house, and he decided he'd walk on up home and he went outside and Mr. Cole followed him outside and still arguing and so forth and Mr. Cole hit him again and he knocked him down again and when Mr. Cole came up he had a knife in his hand, and after taking the knife out of his hand he knocked him down again and from that period on he was kind of vague in his memory."

A question for determination by the trial jury was clearly presented by the evidence.

Accompanying the record in this case and bound with it is the transcript of an affidavit made by appellant's attorney and apparently filed in the court below in support of appellant's motion for a new trial. We quote from it because it clearly states an issue which appellant urges is cause for reversal of the judgment:

"At the close of the testimony, the defendant requested several written charges, one of which was as follows: 'Charge no. 9: The Court charges the jury that if the jury believes from the evidence that the defendant, at the time he is said to have killed the deceased, was so drunk that he was incapable of forming the purpose to do a voluntary act, then he cannot be convicted of any offense higher than manslaughter in the second degree.' The Court first marked 'Given' on this charge and started to read it to the jury, however, when the Court reached the words 'higher than' in said charge, the Court changed the remaining words to read 'murder in the second degree', the Court then marked 'Refused' on this charge and set it aside, however, it had been read to the jury as follows: 'The Court charges the jury that if the jury believes from the evidence that the defendant, at the time he is said to have killed the deceased, was so drunk that he was incapable of forming the purpose to do a voluntary act, then he cannot be convicted of any offense higher than murder in the second degree'.

"At the close of the Court's charge to the jury, I arose to object to the Court changing the wording of the requested charge numbered nine. I had started to point out to the Court what had happened and had said 'Your Honor I think you missed one of my requested charges', when the Court cut me off with the statement 'I let two of them slip by that I'm not giving, I'll give you a refusal, do you have any exception other than that?' "

■ Appellant's counsel points out to this court that in Spivey v. State, 26 Ala. 90, this court clearly held that:

"It was the legal right of the defendant to ask charges to be given. It was the duty of the court either to give them or refuse them. If they were refused, the defendant had the right to take his exceptions, and obtain a revision of the refusals in this court. If they were given, the defendant was thereby deprived of his right of exception and revision."

Clearly, this always has been and still is the law.

■ On the other hand, it is equally settled law in this State that the Court of Appeals is bound only by the transcript of the record before it, and upon it alone must base its decision. Ragsdale v. State, 134 Ala. 24, 32 So. 674, Ala.Dig.Crim.Law ⬥1088. As pointed out above, this record cannot include the ex parte affidavit.

Looking then to the record for the error asserted by the appellant's attorney in his affidavit, we are unable to find it. What we do find, is Charge 9 in the words which the affidavit reports it was requested marked "Refused" and signed "A. H. Elliott, Judge", and this discussion following the judge's charge to the jury:

"MR. OWENS: Your Honor I think you missed one of my requested charges—

"THE COURT: I let two of them slip by that I'm not giving, I'll give you a refusal, do you have any exception to that?

"MR. OWENS: Yes Sir. I object to that part of the court's oral charge * * *."

■ The record shows that the trial court refused thirteen of the twenty charges requested by the appellant. The record does not show that he called to the attention of the trial judge that one of the requested charges was read to the jury in a form other than requested and then marked "Refused". His statement to the trial judge could have referred to any of the charges which were refused. Had his statement been, "Your Honor, I think you *misread* my requested charge nine—", then he would have properly called any error to the attention of the judge who would have had an opportunity

**170**

to correct it if he, in fact, did so err. As the record stands before us now, it reveals no error in this matter for the consideration of this court.

■■ Charge nine was properly refused because it was misleading and stated an incorrect proposition of law. In Gosa v. State, 273 Ala. 346, 139 So.2d 321, a similar charge "was held bad because it permits drunkenness to reduce homicide to manslaughter in the second degree, whereas the correct rule in this jurisdiction is that drunkenness may reduce the degree of the homicide from murder to manslaughter but is no defense as to either degree of manslaughter." There also, in discussing a similar charge, Justice Coleman held, "The words 'forming the purpose' are misleading."

■ Charge 3 was properly refused as an abstract statement.

■ Charges 1, 2, 11, 12, 13, D and E were the general affirmative charges and were properly refused by the court. The remaining Charges 8, 10, 14 and 15 were erroneous statements of the law and were properly refused on the same authority as refused Charge 9. Gosa v. State, supra; Helms v. State, 254 Ala. 14, 47 So.2d 276.

"Voluntary drunkenness neither excuses nor palliates crime. But in murder cases evidence of drunkenness to such degree that the accused is incapable of rational action and hence incapable of forming a specific intent essential to a malicious killing may reduce the killing to manslaughter, or may negative the premeditation and deliberation essential to murder in the first degree, and reduce the crime to murder in the second degree. Ivory v. State, 237 Ala. 344, 186 So. 460; King v. State, 90 Ala. 612, 616, 8 So. 856.

"The jury was instructed by the oral charge of the court and by special charges given at the request of the defendant as to this rule of law. The evidence of drunkenness in this case was sufficient to make an issue before the jury on this question.

"Accordingly we hold that there was no reversible error in refusing to give the affirmative charges requested by the defendant as to the several degrees of homicide and in overruling the grounds of the motion for new trial which were predicated on the weight of the evidence." Helms v. State, supra.

We find no error to warrant a reversal of this cause and the same is hereby

Affirmed.