On the afternoon of June 26, 1980, Delores Argo gave a ride to two strangers, Sherry Ragland and the defendant, in Midfield. The defendant placed a knife to Ms. Argo's throat, and, with Ms. Ragland's willing assistance, took control of her automobile and robbed her of the money in her purse. The abduction ended when Ms. Argo escaped in Montgomery and the defendant wrecked her automobile in attempting to flee from the alert Montgomery police.
The defendant was indicted for first degree robbery. Sentence was 21 years' imprisonment.
 I
The defendant contends that he was denied his Sixth Amendment right to a speedy trial. The chronology of facts and events governing this issue are:
 June 26, 1980: The defendant was taken into custody[1] for the robbery of Delores Argo.
 December 5, 1980: Indictment returned for first degree robbery.
 December 18, 1980: The defendant's case was placed on the circuit court's regular trial docket.
 February 19, 1981: Counsel was appointed to represent the defendant.
 February 23, 1981: The defendant was arraigned and his case set for trial. The defendant filed a motion for recusal directed to the trial judge. *Page 1346 
 March 4, 1981: The defendant's motion for recusal was granted.
 April 7, 1981: The defendant's case was continued. The record reflects that the defendant was "in the penitentiary." No objection by the defendant appears in the record.
 June 8, 1981: The defendant's case was continued with the record reflecting the same notation as that made on April 7. No objection by the defendant appears in the record.
 June 22, 1981: The defendant filed a pro se motion for a speedy trial.
 October 20, 1981: The defendant filed pro se motions for discovery, "for psychiatric examination of prosecution witnesses", and for a "copy of minutes of preliminary hearing without charge." Motions were also filed seeking to reveal any agreement between the State and a co-defendant to dismiss the indictment on the bases of a denial of a speedy trial and for failure of the State to prosecute and to suppress the confession. Additionally, the defendant filed a motion requesting his own psychiatric examination.
 October 22, 1981: The defendant's case was continued with the same notations made in the record as that on April 7 and June 8. No objection by the defendant appears in the record.
 December 1, 1981: The trial court ruled on the defendant's motions and empaneled a jury for his trial. His trial began and was recessed for the evening.
 December 2, 1981: The defendant's trial continued and was recessed for the evening.
 December 3, 1981: The jury returned a verdict of guilty against the defendant. The defendant was sentenced, notice of appeal was given, and appellate counsel different than trial counsel was appointed.
The general rules governing the issue of a speedy trial have been repeatedly stated. We find no need to reiterate them here except as they may particularly apply to the facts. See Smithv. State, 409 So.2d 958 (Ala.Cr.App. 1981), and Vickery v.State, 408 So.2d 182 (Ala.Cr.App. 1981), for a discussion of the applicable standards.
The defendant's motions raising this issue merely allege that an inordinate amount of time had passed since his arrest and their filing. No hearing was held during which evidence was presented in support of the motions. Rather, immediately before trial, the trial court, along with counsel from both sides, discussed the motions with the defendant's counsel making oral arguments.
Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101
(1972), established the standards by which a claim of denial of the Sixth Amendment right to a speedy trial was to be reviewed. Such a review involves the assessment of four factors: (1) length of delay, (2) defendant's assertion of his right, (3) reasons for delay, and (4) prejudice to the defendant. A discussion of the latter three factors is unnecessary if the length of delay is not found to be "presumptively prejudicial" or "patently offensive". Watson v. State, 389 So.2d 961
(Ala.Cr.App. 1980); Corn v. State, 387 So.2d 275 (Ala.Cr.App.), cert. denied, 387 So.2d 280 (Ala. 1980). United States v.MacDonald, ___ U.S. ___, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982), makes it clear that the right to a speedy trial is
 "not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges."
It is unclear whether the delay between the defendant's arrest and his indictment was "made necessary by the law itself." Cook v. State, 333 So.2d 855, 858 (Ala.Cr.App.), cert. denied, 333 So.2d 858 (Ala. 1976). The delays due to the several continuances are also unexplained. Assuming *Page 1347 
their occurrence rests with the State, mere inaction on its part is weighed less heavily against it than deliberate prosecutorial delay. Vickery, 408 So.2d at 185. The record reflects that a portion of the delay between the defendant's arrest and trial may be attributed to the normal procedures of the criminal justice system. However, part of the delay was a result of the multiplicity of pre-trial motions filed by the defendant himself.
Based upon the foregoing we do not find the delay between the defendant's arrest and trial long enough to be "presumptively prejudicial" and trigger inquiry into the other factors enumerated in Barker, supra. The delay is not "patently offensive" so as to require a determination of whether it is "justified". The delay in and of itself is insufficient to justify a finding that the defendant's Sixth Amendment right to a speedy trial has been violated. Boykin v. State,398 So.2d 766 (Ala.Cr.App.), cert. denied, 398 So.2d 771 (Ala. 1981);Whitley v. State, 392 So.2d 1220 (Ala.Cr.App. 1980), cert. denied, 392 So.2d 1225 (Ala. 1981); Wade v. State,381 So.2d 1057 (Ala.Cr.App.), cert. denied, 381 So.2d 1062 (Ala. 1980);Washington v. State, 370 So.2d 342 (Ala.Cr.App. 1979);Hawthorne v. State, 362 So.2d 1275 (Ala.Cr.App. 1978).
Nevertheless, we have reviewed the record in light of the remaining factors of Barker, supra, and find no violation of the defendant's right to a speedy trial. The defendant failed to illustrate any prejudice as a result of the delay, which can be attributed in varying degrees to the State, the normal criminal case process, and the defendant. The circumstances of this case lend themselves to a showing of "affirmative prejudice." See Moore v. Arizona, 414 U.S. 25, 94 S.Ct. 188,38 L.Ed.2d 183 (1973).
Important and significant factors which we have weighed heavily against the defendant in making our determination are the dilatory measures he exercised before trial. On the day the defendant's case was scheduled for trial he sought a continuance so that he could hire his own attorney although one had been appointed for him for more than ten months. Although the defendant argued that he thought his case had been dismissed, the record reflects that he had at least one week's notice that he was going to trial and during that time failed to even talk to any attorney.
Furthermore, the defendant subpoenaed a large number of witnesses for his trial. Some of these witnesses were inmates of the state penitentiary. From the record:
 "THE COURT: Twenty-two witnesses called on rebuttal for a statement made at the preliminary hearing is an unusual number of witnesses. Not knowing the nature of the testimony, of course, I don't know as to the impact of that.
 "However, I would suspect, looking at this list of witnesses, they are requested in the nature of a dilatory fashion. The Court having no further knowledge of this case than it does, that is just a presumption on my part."
In apparent verification of the trial judge's presumption of intentional delay is the fact that four of the witnesses the defendant had subpoenaed for trial were not called to testify because they either had no knowledge of the case or what knowledge they did have was based on rumor and hearsay.
 II
The defendant contends that the trial court erred in admitting his confession into evidence because he was not adequately advised of his rights under Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and because the statement was involuntary because he was "in pain" and "under sedation."
In attempting to escape from the police the defendant crashed Ms. Argo's automobile into a utility pole. The defendant was injured and unconscious. He was taken to an emergency room and treated. However, the defendant regained his senses in the emergency room. Officer John P. Linskey testified:
 "At first when he came in he was hollering and screaming. He was in a lot of *Page 1348 
pain. Then as the pain subsided, he started getting more cocky instead of pain. So, apparently he was growing less — he was more of a cocky state."
Linskey stated that the defendant was "acting more smart-alecky. His answers would be more sharper in tone."
The defendant was at the Montgomery Police Department at 1:00 A.M. The record does not show what time he was released from the hospital or when he arrived at the police department, although Sergeant Fred House of the Jefferson County Sheriff's Department testified that it was his "impression" that the defendant arrived a "very few minutes" before 1:00 A.M.
Deputy House read the defendant his Miranda rights from a "rights waiver form." The defendant was fully informed of his rights, stated that he understood them and signed the waiver form at 1:27 A.M.
The defendant testified that he did not remember anything.
 "I don't remember nothing until after I was brought here to this jail (Jefferson County). I don't remember the hospital. I don't remember the wreck. I don't remember Sgt. House or even being in the Montgomery County Jail."
The defendant stated that he "assumed" that he was given "drugs for medication" at the hospital but "don't know" and "don't remember". The defendant testified that he had cuts in his head and a ruptured bladder.
Defense counsel objected to the admission of the confession because "it was not made knowingly", because the defendant was "physically incapable at the time of realizing, or knowing, or even remembering that he signed anything", and because the defendant was "under sedation and pain at the time." The trial judge overruled the motion to suppress with the remark that he had "no evidence to support that."
There is nothing in the record to contradict the trial judge's finding of voluntariness apart from the speculation of the defendant that he "assumes" he had been given drugs or medication. Even if medication had been given the defendant at the hospital, there is absolutely no evidence that the defendant was "so far dethroned that he was unable to understand the effect of what he was saying or to give a true account of his actions with respect to the alleged crimes." C. Gamble, McElroy's Alabama Evidence, Section 200.14 (2) (3rd ed. 1977). The mere fact that the defendant had taken drugs sometime before he made a statement does not automatically render a confession involuntary. Nelson v. State,398 So.2d 421, 423 (Ala.Cr.App. 1981).
The best proof that the confession was not of a drug-induced statement is the tape recording of the actual interview. We have listened to this interview just as did the trial judge before ruling on its admissibility. The defendant's answers are responsive to Sergeant House's questions and made without hesitation or waiver. The defendant is able to recall details of the crime — times, routes and distances traveled, names, places, amounts taken, and events in chronological order.
The evidence supports the finding that the confession was voluntarily and intelligently given. The State carried its burden and rebutted the presumption that the confession was involuntary. We find no error in the admission into evidence of the defendant's confession.
 III
The defendant argues that the trial court erred in refusing to allow him to impeach Ms. Argo's testimony.
On cross examination, defense counsel asked Ms. Argo whether she had called the defendant prior to June 26 and asked him "to obtain some drugs" for her and whether she had "arranged" to meet the defendant in Midfield and asked him to take her to Panama City and "get her some drugs." Ms. Argo denied both questions.
In his own defense, the defendant called the victim's father as a witness in an attempt to impeach Ms. Argo. Over the State's objection defense counsel established that Mr. Argo had a telephone conversation *Page 1349 
with the defendant's mother. There was no evidence of when this conversation occurred. Defense counsel then attempted to establish that Ms. Argo had a "drug problem".
 "Q. (Mr. Furner, defense counsel): Let me ask you (Mr. Argo) this: Whether or not during the course of this conversation, that you told Mrs. Byrd that you had a drug problem with your daughter?
 "MR. TUCKER (Assistant District Attorney): Judge, I object.
"THE COURT: I sustain.
 "MR. TUCKER: Once again, to any conversations. It is the rankest form of hearsay.
"THE COURT: Sustained.
 "MR. FURNER: Your Honor, I don't believe it is hearsay. And, furthermore, she has testified under oath she didn't use drugs. I think we have a perfect right to attack her credibility.
 "I specifically asked her that question on purpose and she said no.
"THE COURT: I sustain the objection to it.
 "MR. FURNER: All right. Would you give us an exception to it?
"THE COURT: Give you an exception.
 "Q. All right. Let me ask you this question specifically: Does your daughter have a drug problem?
 "MR. TUCKER: Judge, I object to that. That is nothing but prejudicial. It's just an attempt to undermine the State's case.
 "THE COURT: Sustained. Disregard that, ladies and gentlemen. I will give you an exception to the Court's ruling.
 "MR. FURNER: In other words, the Court is not going to allow us to attack the lady's credibility, the statement she made on the stand under oath, that she does not use drugs?
 "THE COURT: The question, when it was asked, could well have been sustained. The Court did not sustain the objection to that, since the question was answered in the negative.
 "However, the question was such that the Court would have sustained it. It was not a matter that could be gone into, because it was not an offense that would be raised at that time. So, I sustained the State's objection to it at this time. I will give you an exception.
 "MR. FURNER: All right. I would like for the record to show, that we are asking this for the sole and only purpose of attacking her credibility. I have no further questions."
Initially, we note that defense counsel, contrary to his representations at trial, never specifically asked Ms. Argo if she used drugs. No contention to the contrary is made on appeal.
The action of the trial judge was correct.
 "A witness' addiction to a narcotic drug is not admissible to impeach him unless one of the following are shown: (1) that he is under the influence of the drug at the time of his testifying, (2) that he was under the influence of the drug at the time of the event of which he testifies or (3) that his mind is generally impaired by the habitual use of narcotic drugs." C. Gamble, McElroy's Alabama Evidence, Section 141.01 (3) (3rd ed. 1977), citing Standard Oil Co. v. Carter, 210 Ala. 572, 98 So. 575 (1923).
This is in accord with the principles found in the annotation on the use of drugs as affecting the competency or credibility of a witness at 65 A.L.R.3d 705 (1975).
 "As to the effect of drug use upon credibility, the courts may diverge in regard to the circumstances under which such use may be shown, but the vast majority recognize that drug use may affect a witness' testimonial credibility. An examination of the diverse circumstances presented in the cases reveals that the courts, either expressly or by implication, discuss the credibility question through an analysis of the purposes for which specific evidence concerning drug use is introduced. Thus, evidence showing that a witness was under the influence of drugs at the time of testifying, or at the time of the events testified to, is admissible to impeach the witness' credibility, as is evidence of general facultative impairment *Page 1350 
through drug use. The oft-expressed reasoning attendant upon the admission of drug use evidence for these purposes emphasizes the effect of drugs upon the ability of the witness to perceive, recall, or relate, in general; the ability to have perceived the event about which he is testifying if under drug influence at that time; or the ability to have testified credibly when the presence of drugs in the witness' system while testifying may affect the intelligent realization of what is being said.
 "There are also some instances in which the courts have admitted drug use evidence for purposes other than those discussed above in which the effect of drugs on perceptual ability was emphasized. For example, some courts have indicated, in accord with general principles of evidence, that drug use evidence proffered to contradict a witness' denial or direct testimony as to such use is admissible. And courts have held or recognized that evidence of drug use is admissible to show that a particular type of witness, the addict-informer, may be biased in his testimony.
 "However, there appears to be some disagreement on whether evidence of drug use is admissible to show a general lack of veracity on the part of a witness. Most courts which have specifically decided or discussed this issue appear to take the view that evidence of drug use proffered to show lack of veracity is inadmissible. The principle rationales given for this position are that there is no consensus of medical opinion concerning drug use and mendacity, or that evidence of this type is on a collateral issue of which the court has discretion to disallow litigation. In addition, a number of cases appear to support this view, at least by implication, in that the courts have held or recognized that specific drug use evidence was inadmissible because the witness was not shown to have been under drug influence at the time of testifying, or at the time of the events testified to, or the witness' faculties were not shown to have been impaired by drug use. Some courts, however, appear to have held or recognized that drug use evidence is admissible to show inability to tell the truth or a tendency to lie." 65 A.L.R.3d at 712-13.
In this case the defendant could have impeached Ms. Argo's credibility by contradicting her testimony on cross examination but not by showing that she had a "drug problem". However, before defense counsel impeached Ms. Argo by showing that she had requested drugs from the defendant, he should have specified "with reasonable certainty the time when, the place where, the person to whom such supposed statement was made and the substance of such statement." McElroy at Section 157.01 (1).
Because the defendant did not lay a proper predicate for impeachment, because there is and has never been any contention that Ms. Argo was under the influence of drugs at the time of testifying or at the time of the events testified to and because Ms. Argo never directly denied the use of drugs, the action of the trial judge in refusing to allow the defendant to impeach Ms. Argo by showing that she had a drug problem was proper.
 IV
Finally, the defendant contends that the trial court erred in failing to charge the jury on lesser included offenses. The defendant requested in writing that the trial court instruct the jury on the offenses of second and third degree robbery, but did not submit written requested charges covering these offenses.
This issue has not been properly preserved for review. InYates v. State, 390 So.2d 32 (Ala.Cr.App. 1980), this Court, quoting from Smith v. State, 53 Ala. App. 657, 303 So.2d 157
(1974), stated at page 35:
 "`(W)here a party desires the court to extend its oral charge to cover some applicable law in the trial of a case, his remedy is to request a written charge on the subject, which if refused would protect the record and present the matter to *Page 1351 
the Appellate Courts. The rules governing objections and exceptions to the oral charge of the court either in the matter of what the court says or does not say require that if the objection is to what the court did say the remedy is only by exception thereto (Passmore v. State, 47 Ala. App. 189, 252 So.2d 115), and if the objection is to the court's refusal or omission to charge on a particular subject applicable under the evidence the procedure is by way of a requested written charge. (Lewis v. State, 42 Ala. App. 166, 157 So.2d 38; Tranholm v. State, 38 Ala. App. 57, 77 So.2d 491).
 "`A failure to pursue one of the remedies above set out, if proper and applicable to the case, is a waiver of a review by this court as to the matters in question.'"
See also Travis v. State, 397 So.2d 256 (Ala.Cr.App.), cert. denied, 397 So.2d 265 (Ala. 1981).
Additionally, charges on second and third degree robbery were inappropriate as the evidence in the case pointed either to the guilt of the defendant as charged in the indictment or to his innocence. An accused is entitled to have the jury charged on a lesser included offense only where there is a reasonable theory from the evidence to support the lesser offense. Johnson v.State, 398 So.2d 393 (Ala.Cr.App. 1981); Williams v. State,377 So.2d 634 (Ala.Cr.App.), cert. denied, 377 So.2d 639 (Ala. 1979).
We have examined each issue raised by the defendant in brief. We find no error and therefore this cause is hereby affirmed.
AFFIRMED.
All Judges concur.
[1] The record does not reflect the date of defendant's arrest. However, in his pro se motions for a speedy trial, defendant refers to June 26 as the date of his arrest.