Benward Earl Adams was indicted for the murder of one, George Thomas, in violation of § 13A-6-2, Code of Alabama 1975. The jury found the appellant "guilty as charged in the indictment." The trial *Page 1144 
judge sentenced the appellant to life imprisonment in the penitentiary.
Around 8:00 p.m. on February 17, 1984, Bertha Austin went to the Capri Lounge in Mount Vernon, Alabama, with Colice Flott and Austin's three sisters, Helen, Jackie, and Roberta. When they arrived, they sat at a table near the D.J.
At approximately 8:30, the appellant came to the Capri with Deliah Thrash and Mickey Earl Williams. The three sat at a table near the back of the lounge. The appellant is the father of Alberta Austin's child.
The victim, Thomas, came into the lounge around 11:30 p.m. Austin had dated the victim in the past. Thomas, the victim, stood at the bar for a while and then sat down at the table where Austin was sitting.
A short while later the appellant, Adams, came over to Austin's table. He told Austin that he didn't care what she did but he did not want the victim, Thomas, around his baby. The appellant told the victim that he was tired of the victim picking on him and he wanted Thomas, the victim, to stay away from his child. The two began arguing.
The victim told the appellant to leave. Thrash and Williams then persuaded the appellant to leave the lounge.
A little later, the victim told Austin that he was going home. Austin warned him to be careful when he went outside. Austin testified that she was scared something might happen because the appellant, Adams, had been drinking.
Ten minutes after the victim left the lounge, someone came inside and said that there had been a shooting. When Austin went outside, she saw the victim, Thomas, lying on the ground.
Deliah Trash testified that at approximately 8:00 p.m. on February 17, 1984, the appellant came over to her sister's house. While there, the appellant took a shot of whiskey.
Around 9:00 p.m., Thrash, the appellant, Mickey Earl Williams and Herman Lee Williams went to the Capri Lounge. At first, the appellant did not want to go to the Capri because he said he didn't want any trouble. Thrash finally convinced the appellant to go. Once inside, the four sat at a table in the back.
At some point, Thrash saw the appellant go over to Austin's table. She heard the appellant talking loud about his baby. Then the appellant left.
Thrash went outside a little later and saw George Jackson talking to Roberta Austin. She heard a gunshot and saw the victim fall to the ground. She then saw a car drive past the lounge that looked like the one she came in that night.
Roberta Austin stated that she was outside of the Capri around 1:00 a.m., talking to George Jackson. The victim came out and asked for a cigarette. He said he was going home. The victim was walking with a cigarette in one hand and a lighter in his other hand. Austin heard a shot and saw the victim fall.
George Jackson testified he got to the Capri at 9:00 p.m. on the night in question. At some point, Jackson saw the appellant go over to Austin's table. The appellant wanted Austin to go outside with him, but she wouldn't go. As the appellant started to walk away from the table, Jackson saw the appellant slap the victim Thomas's arm.
Jackson and the owner of the Capri then went over to the table. Jackson told the appellant, Adams, to calm down and the owner asked the appellant to leave. The appellant then said to the victim, "I'm going to kill your ass when you come on the outside." (R. 86). He then left the Capri.
About 15 minutes later, Jackson went outside and started talking to Roberta Austin. The victim came outside ten minutes later and said he was going home. The victim had a cigarette in one hand and a lighter in the other hand.
Jackson heard someone say "George" and then he heard a shot. After the victim fell to the ground, Jackson saw the appellant *Page 1145 
throw a shotgun in the back seat of a black and white Maverick and leave.
Anthony Flott said he was outside of the Capri Lounge talking to Mary Rogers some time after midnight. He saw a brown and white Maverick turn into the Capri parking lot. He saw the door open and somebody's feet hit the ground. Then an object came out of the car and Flott heard a gunshot. The car then drove off.
Gary Cumberland, pathologist with the Department of Forensic Sciences, testified that he performed the autopsy on the victim, Thomas. Cumberland determined the victim died as a result of a gunshot wound which perforated his neck, chest and abdomen.
Carl McCastle, an officer with the Mount Vernon Police Department, testified that he received a call concerning a shooting at the Capri Club at 1:20 on the morning of February 18, 1984. When he arrived at the scene, the victim was lying face down with a cigarette in his mouth and a lighter in his hand. McCastle called for an ambulance and secured the scene.
Larry Martin, the Chief of Police in Mount Vernon, testified that the call about the shooting came in about 1:19 a.m. McCastle was then dispatched to the scene.
At 1:25 a.m., the appellant came into the police station with Mickey Earl Williams and two other people. He arrived in a white over brown vehicle. The appellant was crying and said he'd shot somebody at the Capri. The appellant had been drinking.
He was then taken into custody. When Martin moved the appellant's car, he found a shotgun on the front seat. This shotgun was turned over to Dale Carter of the Department of Forensic Sciences. Another shotgun was given to Martin by Deputy Faircloth of the Mobile County Sheriff's Department. This gun was also turned over to Carter.
Carter, a firearm and toolmarks examiner, was unable to determine from which gun the fatal shot was fired. He did determine that the gun was fired from a distance of more than twenty-five feet.
John McCormick, a detective with the Mobile County Sheriff's Department, testified that he took statements from several witnesses immediately after the shooting. McCormick stated that he didn't attempt to obtain the appellant's statement because the appellant appeared to be under the influence of alcohol.
The next night, McCormick went to see the appellant. The appellant was advised of his Miranda rights and signed the waiver of those rights. He indicated he understood his rights before signing the waiver. The appellant then gave a statement. No threats, promises, hopes of reward or other inducements were made to the appellant in order to obtain his statement.
In his statement, the appellant stated that he got into an argument with Austin and the victim, Thomas, at the Capri on the night in question. After the argument, he and Mickey Earl Williams left the Capri and went to his car. A short while later, the victim came out of the Capri and started walking toward the appellant's car. The appellant then reached for a gun that was in the car and shot the victim, Thomas.
The appellant's brother, J.C. Adams, Jr., testified that the victim and the appellant had previous altercations between them. Adams said the victim, Thomas, liked to fight.
Harold Williams stated that he was present when the appellant pulled a gun on the victim approximately six months before the victim's death.
Mickey Earl Williams testified that the appellant didn't want to go to the Capri that night because he didn't want trouble. When he and the appellant left the Capri that night, they couldn't get the appellant's car started. As they were working on the car, the victim started walking towards the car. The appellant told the victim not to come any closer. He had the gun in his hand. Williams tried to grab the appellant's arm and the gun went off. The appellant then went to the police station. *Page 1146 
 I
During the closing arguments, the prosecutor made the following remark:
 "MS. TANNER: And I submit to you that Mickey Earl Williams came into this courtroom and lied on behalf of the defendant at his direction.
"MR. WILSON: Judge, I object.
 "THE COURT: She has a right to argue that, Mr. Wilson. Overrule. (R. 309)
The appellant asserts that the above-quoted statement was an improper comment on the appellant's failure to testify because he was the only person who could testify and deny the statement. The appellant cites us to Vickery v. State,408 So.2d 182 (Ala.Crim.App. 1981) as authority for this proposition.
In Vickery, supra, the following statement was made by the prosecutor during closing argument.
 "MR. HARRISON (Assistant District Attorney): Now, he says that the Defendant asked him for the telephone number of Tom Haas. Now, this was on the cross examination, and then I think on redirect, from the statement of five . . . almost five years ago, in June of 1976, when the notes he had made about that same time or shortly thereafter. Mr. Haas (defense counsel) brought `em out and said well, who got the phone number, who dialed the number or who looked up the number or whatever. He gets this other information — it says Tom, looked up the phone number of Tom . . . the residence of Tom Haas on that Saturday, was asked to look up that telephone number. Now, have you heard any testimony that Sergeant Gill did not do that? Have you heard one word that Sergeant Gill did not do that?" (Emphasis added).
Vickery, supra at 186.
This court held the prosecutor's remark in Vickery, supra, was an improper comment on the defendant's failure to testify because he was the only person who ". . . could refute the testimony of Sergeant Gill concerning the circumstances of the telephone conversation with his attorney." Vickery, supra, at 186.
However, there is one glaring distinction between Vickery, supra, and the case at bar. In Vickery, supra, our court, by emphasizing the last two lines of the prosecutor's remark, felt that those were the key words which necessitated the reversal of that case on that issue. The prosecutor asked the jury specifically if they had "heard any testimony" or "heard one word." "that Sergeant Gill did not do that." Since the defendant was the only person who could refute the testimony of Sergeant Gill, the fact that the prosecutor made a comment about the lack of testimony to refute Gill's testimony was reversible error.
The prosecutor in the case at bar did not make a similar statement about the lack of testimony or evidence. In fact, even if she had, the appellant was not the only person who could refute the statement. Mickey Earl Williams could have denied that he was lying at the appellant's direction.
Moreover, the prosecutor's remark was a proper comment on Williams' credibility. The credibility of a witness is a proper subject for criticism and discussion by either party during closing arguments. Milton v. State, 417 So.2d 620
(Ala.Crim.App. 1982); Flint v. State, 370 So.2d 332
(Ala.Crim.App. 1979); Smith v. State, 344 So.2d 1239
(Ala.Crim.App.), cert. denied, 344 So.2d 1243 (Ala. 1977).
"Counsel for both the State and appellant are allowed wide latitude in drawing reasonable inferences from the evidence in their closing arguments. A prosecutor as well as defense counsel has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference. Manigan v. State, Ala.Cr.App., 402 So.2d 1063, cert. denied, Ala., 402 So.2d 1072 (1981)." Milton, supra, at 622.
There was a great deal of evidence, presented at trial, which directly contradicted Williams' testimony. The prosecutor could have easily drawn the reasonable inference *Page 1147 
from the evidence that Williams was in fact lying. There is no basis of error to reversal here.
 II
The appellant contends the State failed to present sufficient evidence to support his conviction, because the evidence shows he was so intoxicated that he was unable to form the necessary specific intent to commit murder.
 "It is true that the degree of intoxication necessary to negate specific intent and, thus, reduce the grade of an offense must amount to `insanity.' Maddox v. State, 31 Ala. App. 332, 334, 17 So.2d 283, 285 (1944). Mere drunkenness, voluntarily produced, is never a defense against a criminal charge, and can never palliate or reduce the grade of an offense, unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act. Gautney v. State, 284 Ala. 82, 222 So.2d 175 (1969); Walker v. State, 91 Ala. 76, 9 So. 87 (1891). Partial intoxication will not avail to disprove the specific intent, the intoxication must be of such character and extent as to render the accused incapable of discriminating between right and wrong — stupefaction of the reasoning faculty. Green v. State, 342 So.2d 419 (Ala.Cr.App. 1977).
 "However, it is equally clear that the degree of intoxication exhibited by an accused, such as to reduce murder to manslaughter, even where the evidence is in sharp conflict, is for the jury to decide. Helms, supra; Chatham v. State, 92 Ala. 47, 9 So. 607 (1891); Maddox, supra."
There was some evidence presented at trial that the appellant had been drinking on the night in question. The jury was charged on both the offenses of murder as well as manslaughter. Whether the appellant's degree of intoxication was such that it would reduce murder to manslaughter was a question for the jury, which they properly resolved in this cause under the evidence presented.
 III
The appellant alleges that the trial court committed reversible error by failing to instruct the jury on "evidence of intoxication as it relates to manslaughter." (Appellant's brief, p. 12.)
The trial judge did instruct the jury on murder, manslaughter and intoxication. He did not specifically charge the jury on intoxication as it relates to manslaughter. However, this issue is not preserved for our review.
 "In Yates v. State, 390 So.2d 32 (Ala.Cr.App. 1980), at page 35 we stated:
 "`In Smith v. State, 53 Ala. App. 657, 303 So.2d 157
(1974), we stated:
 "`"[W]here a party desires the court to extend its oral charge to cover some applicable law in the trial of a case, his remedy is to request a written charge on the subject, which if refused would protect the record and present the matter to the Appellate Courts. The rules governing objections and exceptions to the oral charge of the court either in the matter of what the court says or does not say require that if the objection is to what the court did say the remedy is only by exception thereto (Passmore v. State, 47 Ala. App. 189, 252 So.2d 115), and if the objection is to the court's refusal or omission to charge on a particular subject applicable under the evidence the procedure is by way of a requested written charge. (Lewis v. State, 42 Ala. App. 166, 157 So.2d 38; Tranholm v. State, 38 Ala. App. 57, 77 So.2d 491).
 "`"A failure to pursue one of the remedies above set out, if proper and applicable to the case, is a waiver of a review by this court as to the matters in question."'"
Parham v. City of Opelika, 412 So.2d 1268, 1269 (Ala.Cr.App. 1982).
The appellant failed to file a requested written charge on this subject and, therefore, did not preserve this issue for our review. Hollis v. State, 399 So.2d 935 (Ala.Cr.App. 1981). *Page 1148 
The judgment of the trial court is due to be, and is hereby, affirmed.
AFFIRMED.
All the Judges concur.