[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 149 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 150 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 151 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 152 
Larry Reynold Smith was convicted of murder for the death of Dennis Wheeler Harris, made capital because it was committed during a robbery. See § 13A-5-40(a)(2), Ala. Code 1975. The jury recommended, by a vote of 12 to 0, that Smith receive the death sentence. The trial court imposed the death sentence recommended by the jury and Smith appeals. We affirm.
Chief Investigator Mike Whitten of the Marshall County Sheriff's Department testified that he received a report on September 29, 1994, that Dennis Harris was missing. He stated that he then began to talk with various individuals and determined that Harris had last been seen on September 23, 1994. Whitten testified that on the night of October 3, 1994, he received a report that Harris's body had been discovered. At approximately 11:00 p.m., Whitten located Harris's body in a wooded area in Marshall County, approximately 100 yards from a dirt road. He testified that the area was secured and that a deputy remained on the scene until Whitten and other officials returned early the following morning.
Whitten stated that the scene remained unchanged overnight and that the weather conditions were constant. Photographs were taken of the body and the surrounding area. Whitten stated that Harris's body was lying face down and was badly decomposed. He stated that the head had completely separated from the body. The skull was exposed, having been separated entirely from the scalp and hair. Harris was wearing a plaid *Page 153 
shirt and shoes with no socks. Whitten testified that it appeared that Harris had died as a result of a gunshot wound to the head.
Whitten testified that he began to investigate the case as a homicide and also said that he questioned many of the people he had spoken with in investigating the missing persons report. In the course of the investigation, Whitten learned that Harris, was a friend of Smith's and that he was a best friend of Tanya Harris, Smith's wife. Whitten stated that he received a telephone call from Carl Cooper, an acquaintance of both Smith and Harris, and that based on the information Cooper gave him, he narrowed his investigation to Smith.
Cooper testified that he had known Smith for six or seven years and that he had been acquainted with Harris for approximately one year. He stated that he met Harris through Smith, and that he had also previously worked with Harris. Cooper testified that he would see Harris at Smith's mother's apartment or at Harris's apartment. He testified that he had read a newspaper report of Harris's disappearance and that he informed the authorities of a conversation he had with Smith about plans to rob Harris. Cooper testified that, before the murder, he and his wife discussed with Smith and his wife, Tanya, the idea of robbing Harris of cash. Cooper testified that the plan was for Smith and him to cover their faces, hit Harris in the head, take his glasses (without which Harris purportedly could not see) and rob him. Cooper testified that he originally thought the idea was a joke, but that when a similar conversation took place again later, he told Smith that he wanted nothing to do with the plan. Cooper also stated that he had seen Smith borrow money from Harris more than once.
Cooper further testified that he saw Smith with a nickel-plated .25 caliber semi-automatic weapon with a black handle and a black holster. Cooper testified that Smith told him that he had stolen the gun from "a man named Larry" who lived at the Overlook Mountain Lodge.
Larry Moffett testified that in September 1994, he was living at the Overlook Mountain Lodge, and that Smith lived "just [a] couple doors down." He stated that in the summer of 1994, he purchased a .25 caliber chrome gun with a black handle and a black holster. Moffett testified that Smith had looked at the gun and had offered to buy it. Moffett testified that he did not sell Smith the gun, and that he kept it on the nightstand by his bed. He stated that he later noticed that the gun was missing from his nightstand. He said that he confronted Smith and that Smith denied taking the gun.
Amanda Elkins, a co-worker of Harris's, testified that at approximately 1:00 a.m. on Friday, September 23, 1994, she and Harris left work and went to Elkins's house, where they watched television until approximately 4:30 a.m. Elkins testified that Harris left and that she never saw him again. She further stated that when he left, he was wearing gray pants and a red plaid shirt. She did not become aware of his disappearance until over a week later.
Kevin Harville testified that he had become acquainted with Harris after an automobile accident involving Harris. Harville testified that Harris owed him some money as a result of the automobile accident. He stated that since Harris was paid on Thursdays, he would go to his room every Friday to collect a payment towards the debt. Harville testified that he saw Smith and Harris at Harris's hotel room on a Friday in September, sometime between 11:30 a.m. and 12:30 p.m. He stated that he returned to Harris's room the following Friday; however, Harris did not come to the door. Harville later learned that Harris had been reported missing.
Brent Wheeler, an expert in firearms, testified that he examined some bullets or projectiles delivered to him in connection with the Harris homicide. He stated that he was able to determine that they had been fired from a .25 caliber automatic pistol. Wheeler also testified that he went to the scene of the murder and discovered two .25 caliber Remington cartridge cases near where the body was located. He testified that he was able to determine that both shell casings had been fired from the same weapon. *Page 154 
Dr. Joseph Embry, the state medical examiner, testified that when he received Harris's body, it was clothed in a short-sleeved plaid, reddish brown and tan shirt. He stated that the head was essentially skeletonized. There was a 1/4 inch hole in the right side of the back of the skull that displayed characteristics of a gunshot wound. Dr. Embry found a bullet inside the skull. Dr. Embry also testified concerning a second gunshot wound in the left cheek area as evidenced by bone loss beginning around the nose and going out to the area below the eye. He testified that a second bullet was found under the hair. However, he testified that the cause of death was the gunshot wound to the head.
Whitten testified that he was able to verify that a gun matching the description given to him by Cooper had been stolen from Larry Moffett. Whitten stated that on October 11, 1994, he obtained an arrest warrant for Smith and that he arrested Smith at his mother's trailer in DeKalb County. Smith was arrested for the murder of Harris and was taken to the Albertville Police Department where he was informed of his rights and was questioned. Whitten testified that Smith was questioned on two separate occasions, once by him and once by his brother, Andy Whitten.[1] Officer Mike Whitten was present during both interviews and stated that Smith was informed of, and voluntarily waived, his rights before each interview. Whitten stated that Smith gave a tape-recorded statement admitting to robbing and killing Harris. He was then tried for, and convicted of, capital murder. The jury recommended, by a vote of 12 to 0, that Smith be sentenced to death. The trial court followed the jury's recommendation and sentenced Smith to death.
 I.
Smith contends that the trial court erred in allowing the jury to separate over his objection. In support of his argument, he cites § 12-16-9(a), Ala. Code 1975, which required the agreement of the accused, his attorney, and the state before the trial court could allow the jury to separate in a capital case.
We note that the statute Smith cites no longer exists. Effective June 15, 1995, subsection (a), which addressed the separation of a jury during a trial upon the consent of the accused, counsel for the accused, and the state, was deleted. Now, § 12-16-9 provides that the trial court, in its discretion, may permit the jury to separate during the trial in any felony case. No longer are the accused, counsel for the accused, and the state required to agree to the separation.
We note that, at the time of Smith's trial, there was a variance between the statute, as amended, and Rule 19.3, Ala. R. Crim. P. This Court in Stewart v. State [Ms. CR-90-415 September 26, 1997], ___ So.2d ___ (Ala.Cr.App. 1997), recognized this conflict and held that § 12-16-9 implicitly and effectively overruled Rule 19.3, Ala. R. Crim. P. Specifically, we held that "[s]ection 12-16-9 authorizes a trial court, in its discretion, to allow a jury to separate in all trials, both capital and noncapital." Stewart, ___ So.2d at ___. Therefore, the trial court did not err in allowing the jurors to separate during Smith's trial. We also note that on October 8, 1997, the Supreme Court of Alabama amended Rule 19.3, Ala. R. Crim. P., effective December 1, 1997, to conform to § 12-16-9, Ala. Code 1975.
 II.
Smith contends that the trial court considered inappropriate factors in determining that the statutory mitigating circumstance of "no significant history of prior criminal activity" did not exist. Specifically, he contends that when he attempted to argue that mitigating circumstance should be considered because, he said, his past criminal history was relatively minor, the trial court commented that it did not believe that a person who admitted using marijuana and being addicted to crack cocaine had a very minor background. (R. 1641.) *Page 155 
One of the statutory mitigating circumstances that must be considered before sentencing a person to death is a lack of a significant criminal history. § 13A-5-51(1), Ala. Code, 1975. The law is clear that only convictions can negate this statutory mitigating circumstance. Hallford v. State, 548 So.2d 526
(Ala.Cr.App. 1988), aff'd, 548 So.2d 547 (Ala.) cert. denied,493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). Clearly, as the state notes, had the trial court considered Smith's prior admitted marijuana and crack cocaine use in determining that the mitigating circumstance of "no significant history of prior criminal activity" did not exist, the court would have erred.Parker v. State, 587 So.2d 1072 (Ala.Cr.App.), aff'd on returnto remand, 610 So.2d 1171 (Ala.Cr.App. 1991), aff'd,610 So.2d 1181 (Ala. 1992). During the final sentencing hearing, the trial court commented on Smith's drug use. However, the comment was directed toward Smith's admitted drug history as set out in the presentence report; there is no evidence to suggest that the trial court considered this information in sentencing Smith. There was absolutely no mention of any of Smith's drug history in the trial court's detailed and specific 11 page sentencing order. There was no reference to anything but prior convictions. Therefore, in reviewing the written findings of the trial court, we find nothing to suggest that the trial court improperly considered Smith's history of drug use in sentencing him to death. It is well settled that trial courts are presumed to know the law and to apply it in making their decisions. Walton v.Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).
 III.
Smith contends that his death sentence must be reversed because, he argues, the trial court considered as an aggravating circumstance that he was "under sentence of imprisonment" at the time of this crime, and, he says, the state failed to prove this circumstance. Specifically, he contends that the state's only evidence that he was under sentence of imprisonment from a prior conviction was the testimony of Smith's probation officer, and he argues that this method of proving convictions is invalid.
At the penalty phase of Smith's trial, the state relied upon two aggravating circumstances: that Smith committed the offense during the course of a robbery, § 13A-5 49(4); and that Smith was under a sentence of imprisonment at the time of the offense, § 13A-5-49(1). At issue here is the state's reliance on §13A-5-49(1), that "[t]he capital offense was committed by a person under sentence of imprisonment." As used in this section,
 "the term [under sentence of imprisonment] means while serving a term of imprisonment, while under a suspended sentence, while on probation or parole, or while on work release, furlough, escape, or any other type of release or freedom while or after serving a term of imprisonment, other than unconditional release and freedom after expiration of the term of sentence."
§ 13A-5-39(7), Ala. Code 1975 (emphasis added).
At the outset, we note that Smith did not raise this issue at trial. He did not object when the state argued the existence of this aggravating circumstance (R. 1549, 1584), nor did he object when the trial court gave its jury instructions on this issue (R. 1605-07). While we note that Smith did make an objection at the conclusion of the jury charge, this objection was on the basis that the instruction "doesn't delineate the . . . nature of the offense as being a property offense versus an offense against a person or involving the use of force." (R. 1616.) While this does not preclude this court's review of that claim, it does weigh against any finding of prejudice. See, Kuenzel v. State,577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.) cert.denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). Moreover, this court may review this claim only under the plain error rule set out in Rule 45A, Ala. R. App. P. Alabama law has consistently provided that the plain error doctrine should be applied only to correct particularly egregious errors, i.e., those that if unnoticed would seriously affect the fairness and integrity of judicial proceedings. Kuenzel, supra. *Page 156 
Clearly, the state has the burden at the sentencing hearing to prove beyond a reasonable doubt the existence of any aggravating circumstance. § 13A-5-45(e). This prior conviction may be proved by a properly certified case action summary; however, there is no requirement that a prior conviction can be proved only by this type of documentary evidence. DeBruce v. State,651 So.2d 599 (Ala.Cr.App. 1993), aff'd, 651 So.2d 624 (Ala. 1994). Smith never denied that he was on probation and still does not deny it on appeal. In fact, Smith testified that he visited his probation officer, Ms. Smallwood, and that he was reporting to her as the result of a third-degree burglary conviction. Additionally, Ms. Smallwood testified at trial concerning Smith's visits to her and verified Smith's testimony concerning the fact that he was on probation at the time of the present crime. In essence, Smith admitted a prior felony conviction. Therefore, it is deemed proven for purposes of the statute. See Reed v. State,691 So.2d 463 (Ala.Cr.App. 1996); Martin v. State,687 So.2d 1253 (Ala.Cr.App. 1996); Cade v. State, 491 So.2d 1075
(Ala.Cr.App. 1986). We find no error here.
 IV.
Smith contends that his conviction and sentence must be vacated because, he says, they were premised on evidence that should have been suppressed. He contends that he was arrested in his home without probable cause pursuant to what, he argues, was a facially invalid warrant. Specifically, he contends that the warrant by which he was arrested was facially invalid because, he says, it was unsigned, it was not supported by an affidavit, and it presented no facts that would supply probable cause. Therefore, he argues that as a result of what he deems an "illegal arrest," any statements that he gave the officers should have been suppressed.
At the outset we note that, for whatever reason, it appears that the warrant of arrest in the clerk's record is not the same one considered by the trial court. Smith is correct that the warrant in the record was not signed by the requesting officer or the magistrate. (C.R. 169.) However, after reviewing the record, we conclude that the warrant presented to the trial court during the hearing on the motion to dismiss was signed by a magistrate and the requesting officer. (R. 298.) Specifically, the trial court stated, "I'm looking at what appears to be a warrant issued October 11, 1994, in the back of the court file signed by Mr.Cordes as magistrate." (R. 298; emphasis added.) Later in this hearing, Smith presented the warrant to Investigator Whitten and asked, "Is that your signature (indicating)?" Whitten responded affirmatively. (R. 303.) Therefore, it certainly appears that the arrest warrant was properly signed. However, we do have some concerns as to the sufficiency of the arrest warrant. From a review of the record, it appears that the complaints alleged in the warrant are "nothing more than the affiant's conclusions that the individual named therein had perpetrated the described offense, without setting out any factual basis for such conclusion." Swain v. State, 504 So.2d 347, 352 (Ala.Cr.App. 1986). (C.R. 169) Nevertheless, as the state points out in its brief to this court, Smith's conviction and sentence are due to be affirmed, regardless of the validity of the warrant.
Section 15-10-3(3), Ala. Code 1975, provides that an officer may arrest someone without a warrant when he has reasonable cause to believe that the person arrested committed a felony. "`Reasonable cause is equated with probable cause.'" Sockwell v.State, 675 So.2d 4 (Ala.Cr.App. 1993), aff'd, 675 So.2d 38
(Ala. 1995). "Probable cause is knowledge of circumstances that would lead a reasonable person of ordinary caution, acting impartially, to believe that the person arrested is guilty."Sockwell, 675 So.2d at 13.
 "Probable cause to arrest exists when, at the time the magistrate issues the warrant or the officer makes the arrest, there are reasonably trustworthy facts and circumstances sufficient, given the totality of the circumstances, to lead a reasonable person to believe there is a fair probability that the suspect is committing or has committed an offense."
Swain v. State, 504 So.2d 347 (Ala.Cr.App. 1986), citingFifteenth Annual Review of *Page 157 Criminal Procedure; United States Supreme Court and Courts ofAppeal 1984-1985, 74 Geo. L.J. 499, 518 (1986). As concerns probable cause, we note that the Alabama Supreme Court has held:
 "Probable cause exists if facts and circumstances known to the arresting officer are sufficient to warrant a person of reasonable caution to believe that the suspect has committed a crime. `In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act. . . .' "`The substance of all the definitions of probable cause is a reasonable ground for belief of guilt.'" `Probable cause to arrest is measured against an objective standard and, if the standard is met, it is unnecessary that the officer subjectively believe that he has a basis for the arrest.' The officer need not have enough evidence or information to support a conviction in order to have probable cause for arrest. Only a probability, not a prima facie showing, of criminal activity is the standard of probable cause."
Dixon v. State, 588 So.2d 903, 906 (Ala. 1991) (citations omitted).
In determining whether probable cause for a warrantless arrest exists, this court must examine the totality of the circumstances surrounding the arrest. Sockwell, supra. Here, Investigator Whitten testified that he worked for the Marshall County Sheriff's Department and that he was in charge of investigating Harris's death. He testified that he talked with numerous people concerning Harris's murder and determined that Harris was murdered on a rural road on Sand Mountain and that he died as a result of a gun shot wound to the head. He testified that he examined the body at the scene and determined that Harris had been shot with a .25 caliber automatic or a .25 caliber pistol.
After further investigation, Whitten discovered that Smith might have recently stolen a .25 caliber pistol. Further, Officer Whitten testified that he had interviewed several people that told him that Smith had planned to rob Harris of his money. Specifically, the robbery plan was that Harris would be approached from the rear, his glasses would be knocked off, and he would be hit over the head. Officer Whitten also testified that he knew that Harris had some association with Smith through his work and through common acquaintances and friendship. (R. 313.) He also testified as to a meeting between Carl Cooper and Smith, while Cooper was wearing a "wire." In the course of the conversation, Cooper and Smith discussed a .25 caliber gun. When Cooper asked where the gun was, Smith responded "don't worry about the gun. I've done away with it. Without the gun, they can't prove nothing." (R. 317.) Whitten further testified that the police had reason to believe that the gun might have been hidden in a "washer area" of the apartment complex where Smith was staying with his mother. Officer Whitten stated that, although they did not recover the gun, they did determine that there was evidence in the dust in that area to indicate that an object similar in size to a .25 automatic weapon had once been placed there. Investigator Whitten testified that after he had collected all of this information, he arrested Smith. (R. 320.)
 "`An officer may arrest any person without a warrant, on any day and at any time . . . [w]hen a felony has been committed and he has reasonable cause to believe that the person arrested committed it.'"
Taylor v. State, 589 So.2d 804 (Ala.Cr.App. 1991), quoting § 15-10-3(a)(3), Ala. Code 1975. See also Rule 4.1(a)(1)(ii), Ala. R. Crim. P.
Therefore, even if the arrest warrant was not valid, there was "probable cause" to arrest Smith without a warrant, and his motion to suppress his confession was properly denied.
Furthermore, there is no merit to Smith's argument that the entry into his home to make the arrest violated Payton v. NewYork, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Payton
concerned a warrantless and a nonconsensual entry into a suspect's home to make a routine felony arrest. There is no evidence here that the *Page 158 
officers' entry into Smith's mother's trailer (where Smith was staying) was without consent. (R. 1127.) As the state pointed out in its brief to this court, "`[t]he consent necessary in thePayton context is consent to enter, not consent to arrest.'" quoting Fortenberry v. State, 545 So.2d 129, 137 (Ala.Cr.App. 1988), aff'd. 545 So.2d 145 (Ala. 1989), quoting in turn UnitedStates v. Briley, 726 F.2d 1301 (8th Cir. 1984).
 V.
Smith also contends that his arrest was illegal pursuant to § 15-10-1, Ala. Code 1975, because Officer Whitten was not acting "within [his] respective counties" when he arrested Smith. Specifically, he contends that because Officer Whitten was the chief investigator for the Marshall County Sheriff's Department, he was outside his jurisdiction when he arrested Smith in DeKalb County. We disagree.
Section 15-10-1, Ala. Code 1975 reads as follows:
 "An arrest may be made, under a warrant or without a warrant, by any sheriff or other officer acting as sheriff or his deputy, or by any constable, acting within their respective counties, or by any marshal, deputy marshal or policeman of any incorporated city or town within the limits of the county."
Smith is correct that § 15-10-1, Ala. Code 1975, states that an arrest may be made with or without a warrant by officers "acting within their respective counties"; however, in view of Rule 3.3, Ala. R. Crim. P., officers are no longer so limited. See Taylor v. State, 666 So.2d 36 (Ala.Cr.App.), aff'd onreturn to remand, 666 So.2d 71 (Ala.Cr.App. 1994), cert denied,666 So.2d 73 (Ala. 1995).
Historically, officers who could arrest someone in their official capacity without a warrant were limited to the political subdivision of the state where the officer was employed. Ex parteWallace, 497 So.2d 96 (Ala. 1986); § 15-10-1, Ala. Code. However, in January 1991, the Alabama Rules of Criminal Procedure became effective. These rules were promulgated by the Alabama Supreme Court, pursuant to its rule-making authority, and were intended to make the practice and procedure for criminal proceedings uniform throughout the state. see Rule 1.1, Ala. R. Crim. P. As concerns any conflict, the rules generally supersede any earlier enacted statutory provision. Prince v. State,623 So.2d 355 (Ala.Cr.App. 1992); § 12-1-1, Ala. Code, 1975.
Specifically applicable here, Rule 3.3(a), Ala. R. Crim. P., provides that "[t]he arrest warrant shall be directed to and may be executed by any law enforcement officer within the State ofAlabama." (Emphasis added.) This rule effectively did away with the requirement that an official may make a legal arrest only in the county or municipality in which the officer is employed. As Justice Maddox noted: "Allowing a `law enforcement officer' to execute a warrant `within the State of Alabama' is a major change in prior practice, in that under § 15-10-1 those officers authorized to make arrests could be made only `within the limits of the county.' . . . [T]he Committee determined that the definition of `law enforcement officer' should be a `functional definition.' See Committee Comments to Rule 3.3." H. Maddox,Alabama Criminal Procedure, Author's Comments, § 3.3 (1990).
This is not the first time this court has addressed this issue. In Taylor v. State, 666 So.2d 36 (Ala.Cr.App.), aff'd on return to remand, 666 So.2d 71 (Ala.Cr.App. 1994), cert. denied,666 So.2d 73 (Ala. 1995), a capital murder case, officers of the Gadsden Police Department had a felony arrest warrant charging an offense in Etowah County. However, Taylor was arrested in Birmingham, and at the time of his arrest, the warrant had not been "domesticated" by a judge or magistrate of Jefferson County. This court determined that, pursuant to Rule 3.3, Ala. R. Crim. P., the arrest was not illegal. Judge Bowen, writing for the court, specifically noted the following:
 "Before the effective date of the Alabama Rules of Criminal Procedure in January 1991, `[a] police officer [could] arrest in his official capacity without a warrant only within the limits of the political subdivision of the state of which he is a police officer.' Ex parte Wallace, 497 So.2d 96, 97 (Ala. 1986). See also Reed v. State, *Page 159 48 Ala. App. 120, 122, 262 So.2d 321, 323
(1972); Jenkins v. State, 339 So.2d 133, 136 (Ala.Cr.App.), cert. denied, 339 So.2d 137 (1976). However, Rule 3.3(a), A.R. Cr. P., provides: `The arrest warrant shall be directed to and may be executed by any law enforcement officer within the State of Alabama.'"
666 So.2d at 60 (footnote omitted).
Because we have determined that Officer Whitten had probable cause to arrest Smith, his arrest of Smith in Jefferson County was legal pursuant to Rule 3.3(a), Ala. R. Crim. P.
 VI.
Smith contends that the trial court erred in failing to instruct the jury on manslaughter and intentional murder as he requested. He contends that the failure to give these "lesser-included-offense" instructions violated his rights to due process, a fair trial, and a reliable verdict.
It is well settled that a defendant is entitled to a charge on a lesser-included offense if there is a reasonable theory to support such a charge. Ex parte Myers, 699 So.2d 1285 (Ala. 1997). This is true even if the defendant denies committing the crime, and even if the state offers evidence supporting the charge. Ex parte Myers. In a capital case, the trial court should refuse to give a lesser-included offense instruction only when the evidence would support a conviction of only the crime charged in the indictment. Myers v. State, 699 So.2d 1281 (Ala.Cr.App. 1996): Holladay v. State, 549 So.2d 122 (Ala.Cr.App. 1988), aff'd, 549 So.2d 135 (Ala. 1989). A charge on a lesser-included, noncapital offense is required only if the evidence provides a reasonable theory to support such a charge. Ex parte Myers.
Smith contends that the evidence supports an instruction on intentional murder, because, he argues, the state failed to show that Harris was shot during a robbery. He contends that the jury could have believed that Smith killed Harris, but that he did not rob him. As concerns manslaughter, Smith contends that in his statement to police (which he says he does not remember making) he said he shot Harris because Harris had commented that Smith's wife was "good in bed." Smith contends that this evidence negated the element of intent necessary for intentional murder. We disagree and find that the evidence simply does not support either theory.
Smith took the stand and expressly denied killing or robbing Harris. He also denied the truth of the statement he made to the police that he had robbed and killed Harris. This defense theory of "I didn't shoot anybody" was presented to the jury. In fact, in closing arguments, the following argument was presented:
 "Larry Smith didn't shoot anybody. He didn't kill anybody. He testified from the witness stand he didn't. "He went through from [the] 22nd of September and I had him go through the 24th. He accounted for every single hour where he was and in whose presence he was during that day. He didn't have time to kill Dennis Harris. He didn't have motive to kill Dennis Harris. He didn't have reason to kill Dennis Harris. And he didn't kill Dennis Harris."
(R. 1493.)
It is undisputed that at trial Smith denied having had anything to do with the murder, and he presented nothing in his defense that would support either lesser-included charge. Furthermore, from a review of the record, we conclude that the state presented nothing that would reasonably support either lesser-included charge. As set out by the trial court, the following facts summarize the crime:
 "The court finds beyond a reasonable doubt that for some time prior to September 23, 1994, [Smith] and others discussed robbing Dennis Wheeler Harris. Harris was a `friend' of [Smith's] who had loaned [Smith] money on several occasions. This conspiracy was discussed from time to time until September 23, 1994. Approximately two weeks before that date, [Smith] stole a .25 cal. automatic pistol from an acquaintance. On that date [Smith] got the victim into his automobile by some means and drove to a remote wooded area. He took the victim from the car on the road and into the woods. Pointing the *Page 160 
stolen gun at the victim, [Smith] demanded his money. After the victim complied and gave [Smith] his money, [Smith] shot Harris in the head. After the victim fell, [Smith] administered a second shot to the head and left. The body was discovered some ten days later. [Smith's] guilt was evidenced not only by his confession but by the testimony of other witnesses as to the prior plot to rob Harris, the theft of the gun by [Smith], his possession of the gun he admitted he had stolen, his presence with the victim shortly before the victim disappeared, [Smith] suddenly having extra money and other incriminating evidence. All of the medical and physical evidence was consistent with the above account."
(C.R. 452-53.)
As to the lesser-included offense of murder, Smith argues that the jury could have reasonably concluded that, while Smith killed Harris, he did not rob him. He makes this argument in spite of the fact that he denies killing Harris. In support of this argument, Smith cites the following portion of the transcript:
 "THE COURT: Explain to me a theory on which a reasonable mind could determine that straight murder had happened without being done in the course of a robbery or unintentionally.
 "[DEFENSE COUNSEL]: Well, ah, if the Court will recall from the statement, ah, I forget what exhibit it was that was admitted into evidence, but it might — I believe it was exhibit — State's Exhibit 16, there was a statement made supposedly by the defendant at the time to the effect that he was merely trying to scare someone and it would give — could give a reasonable doubt as to the intention to commit a robbery."
(R. 1453-54.) However, the portion of the statement that is referred to above actually reads as follows: "I was gonna scare him just to get his money. . . ." (C.R. 388; emphasis added.) As the state points out in its brief to the court, this statement does not diminish the state's evidence tending to prove that there was a robbery, but actually supports such a theory. Furthermore, we point out that in his statement to police, which he denies having any memory of, it was clear that Smith intended to rob Harris. As his statement to police reflects, Smith enticed Harris into his car and drove him on a dirt road to a wooded area specifically so that he could rob him. In pertinent part, the record reveals the following:
 " L.S. . . . I remember going back to Skip's [Carl Cooper] and then, ah, ah, Skip said something about going up there to see if Dennis [Harris] is home to where we can beat the hell out of him and take his money where we'll have more money, extra money, and stuff. I rode by there and then you know it was two or three times we went up there Dennis wouldn't answer the door then, ah, I took Skip home and, ah, dropped him off and I went back up Dennis's a few minutes later and then I, ah, when I went by there he answered the door and then me and him went riding out on that dirt road and. . . .
". . . .
 "L.S.: It's a dirt road out there with a bridge so we stopped and me and Dennis walked over that way going to the edge of the woods and I was following him. I told him to give me his wallet. I was trying to scare him and then, ah, he started saying stuff about my wife was good and all that and I asked him what'd he mean by that and he said it wasn't none of my damned business and then, ah, it happened. I mean. . . .
"A.W.: Then you shot him?
"L.S.: It went too far.
"A.W.: Did you shoot him?
"L.S.: Yes, sir.
"A.W.: Did you shoot him twice?
"L.S.: Yes, sir.
 "A.W.: He handed you the money before you shot him?
"L.S.: Yes, sir.
 "A.W.: Okay. You took Dennis out in the woods to rob him is that correct? *Page 161 
"L.S.: Yes, sir."
(C.R. 385-391.)
Based on the above quoted portion of the record, we find no reasonable theory that would support a lesser-included offense of intentional murder. Under the evidence presented by both the state and Smith, there was no reasonable theory that would support the lesser-included offense of murder.
Regarding the refused charge on manslaughter, Smith's only claim that such a charge should be given is based on the following statement: "I was gonna scare him just to get his money and then he turned around and he said he started saying stuff about you know my wife was good and all this stuff and it just happened." (C.R. 288.) Smith claims that this statement "negated the element of intent necessary for intentional murder." We disagree.
However, we again point out that Smith completely denied having had anything to do with the murder. We find no merit in Smith's argument that because the jury could have concluded that he did not intend to shoot Harris, but that he did so only after Harris commented that "[his] wife was good," the state did not prove the element of intent. There was no evidence presented from which any inference that Harris assaulted or threatened Smith could be drawn, and this court has held that mere words or gestures, however offensive or insulting, will not reduce a homicide from murder to manslaughter. Harrison v. State, 580 So.2d 73
(Ala.Cr.App. 1991).
Therefore, we find no reasonable theory on which to base a charge on the offense of manslaughter. Under the evidence presented by both the state and Smith, the jury could only find Smith guilty of the capital offense charged in the indictment or find him not guilty.
 VII.
Smith contends that the trial court improperly removed three potential jurors for cause, thereby violating his right to a fair trial by an impartial jury. He contends that even though each potential juror stated a general opposition to the death penalty, none said that they would be unable to follow the trial court's instructions.
We note that our review of this issue is pursuant to the plain error rule because Smith failed to object at trial. Rule 45A, Ala. R. App. P.
The "original constitutional yardstick" on this issue was described in Witherspoon v. Illinois, 391 U.S. 510,88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Under Witherspoon, a juror was required to make it unmistakably clear that the juror would automatically vote against the death penalty and that his or her feelings would therefore prevent the juror from making an impartial decision on guilt. However, this is no longer the test. In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844,83 L.Ed.2d 841 (1985), the United States Supreme Court held that the proper standard for determining whether a veniremembers should be excluded for cause because of his opposition to the death penalty is whether the veniremember's views would "`prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" The Supreme Court has expressly stated that juror bias does not have to be proven with "unmistakable clarity." Darden v. Wainwright,477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
Veniremembers S., L., and D. were all struck for cause by the trial court. L. stated that she did not want to serve on the jury because the case involved the death penalty. She stated that she could not vote to impose the death penalty and that she could not think of a situation where she would ever vote to impose the death penalty. S. also stated that he could not vote to impose the death penalty. Although he stated that he was not opposed to the death penalty, he stated that he could not vote to impose it. Finally, although she originally said that she could consider the death penalty, D. stated that, after she saw Smith's mother and his sister, she did not think that she "could do the death penalty."
Examining the record for plain error on this issue, we cannot say that the trial court erred in removing these jurors for cause. *Page 162 
All three clearly indicated that they could not vote to impose the death penalty. In fact, each one stated that, regardless of the circumstances or facts, he or she simply could not vote to impose the death penalty in this case.
 VIII.
Smith argues that his statement to police should have been suppressed, because, he contends, it was involuntary and was made in violation of his Fourth, Sixth and Fourteenth Amendment rights, as well as Alabama law. Smith contends that his statement to police was involuntary because he had been drinking heavily on the day of his arrest and that this "intoxication combined with his fear for his wife's well-being [made him] particularly susceptible to the pressures of custodial interrogation." (His wife was also arrested at the same time Smith was arrested; she was placed in a different car and transported to police headquarters.)
After a hearing outside the presence of the jury, the trial court ruled that Smith's statement was admissible. Later, during the trial, the trial court again allowed Smith the opportunity to present any additional evidence to support his motion to suppress, but did not change its previous ruling of admissibility. The statement, in part, is as follows:
 "A.W. [Andy Whitten]: This is Andy Whitten, Albertville Police Department. It's October 11 — approximately 5:45 p.m. — interviewing Larry Smith. Larry first of all, you've been read your rights is that correct?
"L.S. [Larry Smith]: Yes, sir.
 "A.W.: And you understand your rights, is that correct?
"L.S.: Yes, Sir.
 "A.W.: And with these rights in mind you wish to make a statement at this time?
"L.S.: Yes, Sir.
 "A.W.: Okay, we're talking about an incident that occurred on the 23rd day of September. If you would, Larry, start out the best you can in the morning when you got up; just tell me what you done, okay?
 "L.S.: I went and got my check and, ah, went and got it cashed, ah, first I went and got Skip and went and got my check. Went and [I] got..[it] cashed to Guntersville. I paid on my rings and I think I paid on my drug test and, ah, I remember going back to Skip's [Carl Cooper] and then, ah, ah, Skip said something about going up there to see if Dennis [Harris] is home to where we can beat the hell out of him and take his money where we'll have more money, extra money, and stuff. I rode by there and then, you know, it was two or three times we went up there. Dennis wouldn't answer the door then, ah, I took Skip home and, ah, dropped him off and I went back up Dennis's a few minutes later and then I, ah, when I went by there he answered the door and then me and him went riding out on that dirt road and. . . .
". . . .
 "L.S.: It's a dirt road out there with a bridge so we stopped and me and Dennis walked over that way going to the edge of the woods and I was following him. I told him to give me his wallet. I was trying to scare him and then, ah, he started saying stuff about my wife was good and all that and I asked him what'd he mean by that and he said it wasn't none of my damned business and then, ah, it happened I mean. . . .
"A.W.: Then you shot him?
"L.S.: It went too far.
"A.W.: Did you shoot him?
"L.S.: Yes, sir.
"A.W.: Did you shoot him twice?
"L.S.: Yes, sir.
 "A.W.: Okay, where did you get the gun that he was killed with?
"L.S.: I stole it from Larry.
 "A.W.: He handed you the money before you shot him?
"L.S.: Yes, sir.
 "A.W.: Okay, what did you do with the gun after the theft?
 "L.S.: I hid it in the laundry room for about three or four days. *Page 163 
 "A.W.: Where did you hide it — on top of the door that was [lying] across the beam?
"L.S.: Beside, ah, beside the beam.
 "A.W.: Okay. And you hid it there for how long?
"L.S.: Three or four days.
"A.W.: Then what did you do with it?
"L.S.: I threw it in a dumpster.
". . . .
 "A.W.: Okay. You took Dennis out in the woods to rob him, is that correct?
"L.S.: Yes, sir."
(C.R. 385-91.)
The record reveals that Smith testified that he could not remember anything after he was placed in a police car for transport from his mother's trailer to police headquarters. Yet he claimed to clearly remember specific threatening remarks he alleged the police officers made as he was being taken to the car; but, regarding the statement he made to police, he claims that he remembers "nothing." Specifically, he stated that he remembered everything that happened until the police arrested him. He attributes this apparent memory loss to intoxication.
Officer Mike Whitten testified that Smith was advised of his rights before he was questioned about the murder. In fact, he stated that Smith's rights were read to him several times. An advice of rights form was read to Smith, and the officer stated that he and Any Whitten, his brother and fellow interrogator, made sure that Smith understood its contents. Mike Whitten testified that Smith stated that he understood the form, signed it and marked it to indicate that he understood his rights, and that he still wanted to talk to officials. Whitten testified that Smith was not threatened or coerced into giving a statement and that no inducements, rewards, or hopes of rewards were offered to him.
Concerning Smith's alleged intoxication at the time of the statement, Whitten testified that Smith did not appear to be intoxicated at the time of the arrest or when he gave his statement. According to Smith, he purchased a case and one-half of beer on the morning of his arrest and had consumed 28 or 29 beers. However, his wife, stated that he had purchased only one-half of a case of beer and that some of that beer remained in the case. Furthermore, according to Smith's own testimony, the beer apparently had no effect on his memory until he was placed in the police car.
The threshold for admissibility of any criminal defendant's statement is voluntariness. Tague v. Louisiana, 444 U.S. 469,100 S.Ct. 652, 62 L.Ed.2d 622 (1980). In determining whether a statement was voluntary, courts must use a totality-of-the-circumstances test. Edwards v. Arizona,451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); Magwood v. State,494 So.2d 124 (Ala.Cr.App. 1985), aff'd, 494 So.2d 154 (Ala.),cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). The courts must conclude that the defendant "`made an independent and informed choice of his own free will, that he possessed the capacity to do so, and that his will was not overborne by pressures and circumstances swirling around him.'" Ex partePardue, 661 So.2d 268, 270 (Ala. 1994), quoting Jackson v. State,562 So.2d 1373, 1380-81 (Ala.Cr.App. 1990). Furthermore, a finding regarding the voluntariness of a confession will not be disturbed unless that finding is contrary to the great weight of the evidence and manifestly wrong. A.M. v. State, 623 So.2d 421
(Ala.Cr.App. 1993). Regarding the degree of intoxication necessary to invalidate a statement,
 "[U]nless intoxication, in and of itself, so impairs a defendant's mind that he is `unconscious of the meaning of his words,' the fact that the defendant was intoxicated at the time he confessed is simply one factor to be considered when reviewing the totality of the circumstances surrounding the confession."
Carr v. State, 545 So.2d 820, 824 (Ala.Cr.App. 1989).
 "The intoxicated condition of an accused when he makes a confession, unless it goes to the extent of mania, does not affect the admissibility in evidence of the confession, but may affect its weight and credibility."
Callahan v. State, 557 So.2d 1292, 1300 (Ala.Cr.App.), aff'd,557 So.2d 1311 (Ala. 1989).
Here, there is basically no conflict in the evidence as to what took place during the *Page 164 
questioning of Smith. As stated above, Mike Whitten testified that Smith was informed of his rights and was questioned on two separate occasions, once by him and once by his brother, Andy Whitten. Officer Whitten testified that he was present during both interviews and that Smith was informed of and voluntarily waived his rights each time before the questioning began. Both statements were transcribed and the correct time was reflected on the transcriptions. The first statement was taken at 4:35 p.m. on October 11, 1994, and the second one taken at 5:45 p.m. that same day. Whitten stated that he read the rights form to Smith and that he then gave the form to Smith, who appeared to read it for himself After being given an opportunity to ask questions, Smith signed the form and checked the boxes indicating that he understood his rights and that he wished to talk to officials. Whitten testified that Smith did not appear to be under the influence of alcohol or drugs and that he was not threatened or induced to make a statement. According to Whitten, during the second interview with Officer Andy Whitten, Smith admitted to killing and robbing Harris. Officer Mike Whitten testified that he was in an adjacent room during this second interview and witnessed it through a one-way mirror.
There was no evidence presented to refute Officer Whitten's recollection. Further, there is no indication that Smith was intoxicated to the extent that he could not comprehend the meaning of his words. In fact, an audio-tape of the statement was played to the jury. See Byrd v. State, 421 So.2d 1344
(Ala.Cr.App. 1982) (where this court stated that the best proof that the confession was not a drug-induced statement was the tape-recording of the interview.) Therefore, based on the totality of the circumstances, we can not say that the trial court's admission into evidence or Smith's statement was against the great weight of the evidence or that its admission was manifestly wrong.
 IX.
Smith contends that at his sentencing hearing, the state failed to produce accurate information concerning his prior criminal history. Specifically, he contends that his probation officer, Atha Smallwood, erroneously testified at sentencing that Smith had previously been convicted on two burglary charges, when he had actually been convicted on one burglary charge and one third-degree theft of property charge.
The state called Smallwood as a witness at the sentencing phase of the trial. Smallwood was employed as a state probation officer by the Alabama Probation Office. She testified that, as part of her duties, she supervised individuals who had been placed on probation for various criminal offenses. She stated that Smith was being supervised for offenses he had committed in Jefferson County and that he was on probation during September and October 1994. During this testimony, Smallwood erroneously stated that Smith had been on probation for two burglary offenses in Jefferson County. However, the pre-sentence report correctly indicated that one of the two offenses was actually a conviction for third-degree theft of property. Smith did not object to Smallwood's testimony and did not bring this discrepancy to the attention of the trial court. We note that Smith also testified that he was on probation and specifically stated that he had been convicted of burglary.
Because there was no objection, we will review this issue for plain error. Rule 45A, Ala. R. App. P. Clearly, Smallwood's testimony that Smith had two burglary convictions was in error. However, we do not see how Smith was harmed by this testimony. Smith's allegations that the testimony that he had two burglary conviction made his criminal history "look measurably worse than it really was" and "[t]herefore, the jury was less likely to consider the mitigating circumstances set out in Alabama Code § 13A-5-51 (1)" are without merit. Smith did not raise the mitigating circumstance in 13A-5-51(1) (no significant criminal history). Furthermore, we do not see how testimony that Smith had one burglary conviction and one theft-of-property conviction, instead of two burglary convictions, would have resulted in a different jury verdict.
The harmless error rule applies to capital cases at the sentencing hearing. Lawhorn v. *Page 165 State, 581 So.2d 1159, 1177 (Ala.Cr.App. 1990), aff'd,581 So.2d 1179 (Ala. 1991). Specifically, we held in Lawhorn:
 "We find that the jury's improper consideration of this aggravating circumstance and possibly improper consideration by the trial court did not render appellant's sentencing fundamentally unfair. It is unnecessary to vacate appellant's sentence because we are convinced beyond a reasonable doubt that, had the circumstances been properly narrowed, the jury would have recommended the same sentence and the trial court would have imposed the same sentence. We hold this, even in the face of our recognition of the utmost importance of insuring that a death sentence not be based on arbitrary and capricious action. While we, in theory, would be very hesitant to find harmless error in the submission to the jury of an unconstitutionally defined aggravating circumstance, we find that the facts of this case support such an application beyond a reasonable doubt."
Therefore, we do not find that Smallwood's misstatement about the burglary conviction rendered Smith's sentencing proceeding fundamentally unfair.
 X.
Smith contends that the trial court erred in admitting the photographs of Harris's body in that the admission of those photographs violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the Constitution, as well as Alabama law. Specifically, he asserts that the photographs were extremely prejudicial, that the admissibility standard applied was unconstitutional, and that the state failed to lay the proper predicate for their admission. As a general rule, photographs are admissible if they tend to prove or disprove some disputed fact or material issue. Knotts v. State, 686 So.2d 431, 474
(Ala.Cr.App.), opinion after remand, 686 So.2d 484, aff'd, 686 So.2d 486
(Ala. 1996). Further, photographs are admissible to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence. Gaddy v. State, 698 So.2d 1100 (Ala.Cr.App. 1995), aff'd, 698 So.2d 1150 (Ala. 1997). The photograph must be a true and accurate representation of the subject. Gaddy, supra. A photograph is not inadmissible just because it is particularly gruesome and ghastly, if its admission has "some relevancy to the proceedings, even if the photographs tend to inflame the jury.Knotts, 686 So.2d at 475. The admission of photographic evidence is generally left to the trial court's discretion, and its determination will be reversed only where there has been an abuse of that discretion. Oryang v. State, 642 So.2d 989 (Ala.Cr.App. 1994).
 "The state has the burden of proving that the victim was dead, and this photograph was direct evidence on that point. Perpetrators of crimes that result in gruesome scenes have reason to expect that photographs of those gruesome scenes will be taken and admitted into evidence."
Clark v. State, [Ms. CR-94-1544, March 22, 1996], ___ So.2d ___ (Ala.Cr.App. 1996) (citation omitted).
Here, the state introduced 14 color photographs depicting Harris's body, as well as the crime scene. Smith objected and the trial court, outside of the hearing of the jury, noted, "I don't see anything worse about these than the hundreds all of us have seen in practice. Overruled." (R. 1047-50.) The trial court further noted that the probative value of the photographs outweighed any prejudicial effect because "[t]hey show[ed] whether or not it was obscured out into the woods, [and] they give some indication as to how long the body had been there. They have substantial probative value to them." (R. 1047-50.)
Officer Whitten testified that he was present when the photographs were taken and that the photographs were an accurate and fair depictions of the scene. He testified that he had been present at the scene the night before the pictures were taken and that upon returning to the scene the next morning, he found the scene undisturbed and in the same condition as it was the night before. An officer had been left on the scene to secure it until daylight. There was no general change in the weather. Further, there was testimony that the condition of the body as depicted by the photographs was the result of advanced *Page 166 
decomposition and was relevant to the question of how long Harris had been dead. Therefore, the photographs were relevant to establish a time during which the murder occurred, and they were properly admitted into evidence.
 XI.
Smith contends that the trial court erred in denying fully sequestered individual voir dire examination, and that he was therefore deprived of his due process rights, as well as of a fair and impartial jury. Specifically, Smith claims that the answers of the 12-member panels were affected by the first person to answer the death-qualifying question in each instance. For example, Smith states that the first person questioned on a panel indicted that she could vote for the death penalty and that only one person on that panel subsequently expressed reservations about the death penalty. On another panel, the first person to answer indicated that she could impose the death penalty, and all 11 additional members on that panel indicated likewise. Smith contends that the same pattern was repeated with three other panels. In contrast, Smith contends that when a panel began with a person stating that she would have a problem imposing the death penalty, five other members stated they were undecided or could not impose the death penalty. Based on these examples, Smith contends that this pattern of answers to voir dire question could have been changed with individually sequestered voir dire. He further contends that some potential jurors were "tainted" by a veniremember's recitation of some of the facts of the case during a panel voir dire examination. Specifically, he contends that one of the veniremembers stated that he had heard "that the victim's body had been found near a creek some days after he disappeared," and that had there been individually sequestered voir dire, no other jurors would have heard the remark.
Because it appears that Smith did not object to the trial court's questioning the jury in panels instead of individually, we will review this issue under the plain error rule. Rule 45A, Ala. R. App. P.
There is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination, even in capital cases. George v. State, 717 So.2d 827
(Ala.Cr.App. 1996), rev'd on other grounds, 717 So.2d 844 (Ala.) Furthermore, we have already held that questioning a venire in panels meets the requirements of due process and provides "reasonable assurance that any prejudice on the part of the jurors would be exposed." Haney v. State, 603 So.2d 368
(Ala.Cr.App. 1991), aff'd, 603 So.2d 412 (Ala. 1992).
We have reviewed the record and cannot say that Smith was limited in any way in questioning any veniremembers about their feelings about the death penalty. Regarding Smith's allegations that a panel or veniremembers was "tainted," we likewise find no plain error. Smith does not explain in his brief to this court why he believes the panel was affected by the statement that the body had been found near a creek. As the state points out, the fact that Harris had been dead for some time before the body was discovered was properly admitted at trial. See Brown v. State,571 So.2d 345 (Ala.Cr.App. 1990) (the jury was not harmed by their pretrial exposure to certain facts that were admitted at trial).
 XII.
Smith contends that the state relied on what he says is inadmissible hearsay to prove that Smith committed capital murder. Smith argues that Whitten "testified that somebody told him that Larry Smith had hidden the gun in the laundry room at his apartment complex." The relevant portion of the record is as follows:
 "A. [Officer Whitten]: Ah, after talking with Mr. Cooper, our first initial search or thing we done to try to locate the gun was to stop at the apartment complex there at the corner of Highway 205 and Edmondson Street in Albertville and attempted to locate it in a washroom there at the apartments where we were told that, ah, Mr. Smith had hidden the gun.
 "Q. Okay. Were you able to locate it in that washroom? *Page 167 
"A. The gun itself, no, sir."
(R. 1074-75.)
As the state properly notes, there is just no "out-of-court" statement in the above-quoted portion of the record; therefore, there is no hearsay. In any event, even if Officer Whitten had stated that "Cooper told me that Smith had hidden the gun in the washroom," the testimony would still have been admissible because it was not offered to prove the truth of the matter asserted, but could have been offered to show why Whitten searched the laundry room. We also note that Smith did not object to this testimony, so any review of this is under the plain error rule. Rule 45A, Ala. R. App. P. Smith also contends that the tape-recording of his statement to the police was inadmissible hearsay, because Officer Andy Whitten died before trial and was unavailable to authenticate the recording. We find no merit in this contention. While it is true that Officer Andy Whitten was dead at the time of trial, the recording was properly admitted into evidence.
The proper foundation required for the admission of a sound recording into evidence depends on the circumstances of the case in which the admission is sought. Ex parte Fuller, 620 So.2d 675
(Ala. 1993). If a qualified, competent witness can testify that the recording accurately and reliably represents what the witness sensed at the time in question, the "pictorial communication" foundation must be laid. Ex parte Fuller, supra. Under this theory, the party offering the recording must present sufficient evidence to meet the "reliable representation" standard. In other words, the witness must testify that he or she has sufficient personal knowledge of the sounds recorded and that the tape accurately and reliably represents the actual scene or sounds. Ex parte Fuller, supra.
Here, Officer Mike Whitten testified that when Smith was giving his statement to Officer Andy Whitten, he was in an adjacent room watching the interview through a one-way mirror. Officer Mike Whitten testified that the statement was recorded and transcribed, and that he verified the accuracy of the statement and stated that the voices on the tape were those of Smith and his brother, Officer Andy Whitten. Officer Whitten testified that he had listened to the tape and had compared it to the transcript and that they were both accurate and authentic reproductions of Smith's statement.
The state adequately satisfied the "reliable representation standard" in establishing the predicate for the admission of the tape-recording and the transcript. See Battle v. State,645 So.2d 344 (Ala.Cr.App. 1994).
Smith also contends that the state attempted to prove that he had stolen the gun that he later used to kill Harris through what he contends is the hearsay testimony of Officer Whitten. That specific testimony is as follows:
 "Q: You've heard Mr. Cooper testify this morning. Did he share with you on that occasion basically the same information that he shared with the court today?
"A: Yes sir.
 "Q: Did you then, in reference to that information, proceed to — let's say at least narrow your investigation in the direction of Mr. Larry Smith?
 "A: Yes, sir, it was focus, ah — the further we went, the more focused we became.
 "Q: Okay. Mr., ah, Cooper had told you about a gun, had he not?
"A: Yes, sir, he had.
 "Q: He had told you about that gun being stolen, had he not?
"A: Yes, sir, he had.
 "Q: And from him it was supposed to have been stolen?
"A: Yes, sir.
"Q: Did you verify that report?
"A: Yes, sir.
 "Q: Did you verify that in fact a gun meeting that description had been stolen?"
(R. 1073-74.)
The questions posed to and answered by Officer Whitten had already been asked of and answered by Carl Cooper. Therefore, all of the alleged hearsay evidence was already properly before the jury. There was no prejudice to Smith resulting from Officer Whitten's testimony about the gun. Inmin v. State, 654 So.2d 86
(Ala.Cr.App. 1994). *Page 168 
 XIII.
Smith contends that the trial court erred because it would not permit Smith's character witness, Wendy Terrell, to testify concerning her opinion of Carl Cooper's general reputation in the community.
Smith's sister, Wendy Terrell, testified that her brother had a non-violent nature, and then was asked the following questions about state's witness Carl Cooper:
 "Q: [Defense Counsel]: How often have you been around him?
 "A: [Terrell]: Ah, he was my roommate for several months.
"Q: How long ago has that been?
"A: Ah, two years.
 "Q: Okay. Do you know other people that know him?
"A: Yes
"Q: How many?
"A: A lot.
 "Q: Ah, do you know what type person he is?
"A: Yes.
 "Q: Have you been around other individuals that know him?
"A: Yes.
"Q: Would you say he's a truthful person?
"[District Attorney]: Objection.
"[Court]: Sustained.
"[Defense Counsel]: That's all I have."
(R. 1341-42.)
To impeach the credibility of a witness, a proper predicate must be established that the witness has a personal knowledge of the impeached witness's reputation in the community. Myers v.State, 601 So.2d 1150, 1153 (Ala.Cr.App. 1992)." The impeaching witness' opinion as to the bad general reputation is not to be based upon what he thinks the other's reputation is but what the community as a whole voices it to be." Myers, supra. "The witness's testimony will be excluded if his knowledge of the person's general reputation is based upon his own personal knowledge of the person's character rather than upon what the community thinks of the person." C. Gamble, McElroy's AlabamaEvidence, § 26.02(11) (5th ed. 1996)
Here, there was no proper predicate to show that Terrell had a personal knowledge of Cooper's reputation in the community. Rather, it appears from the record that Terrell was attempting to give her personal opinion of Cooper's character for truthfulness. Therefore, the trial court did not err in excluding this testimony.
 XIV.
Smith contends that the trial court failed to instruct the jury on what weight to accord his prior burglary conviction and that its failure to do so violated his due process rights and his right to a fair trial. Specifically, he contends that "without proper and immediate instruction, the jury likely concluded that it could infer guilt of capital murder from the prior burglary conviction."
This claim must be reviewed pursuant to Rule 45A, Ala. R. App. P., because Smith failed to request such an instruction at trial. The record reveals that the trial court did instruct the jury on the very matters that Smith argues on appeal it should have instructed on. In its oral charge to the jury, the trial court clearly stated that the evidence of the past conviction was not to be considered as evidence of guilt of the charged offense. The trial court specifically set out that the "only consideration [the jury] should give to the prior convictions [is] in determining what weight [the jury will] be giving to the testimony of the defendant and that witness." (R. 1515-16.) The jury was properly instructed on the law regarding evidence of prior convictions, and jurors are presumed to follow the oral instructions of the trial court. Taylor v. State, 666 So.2d 36
(Ala.Cr.App. 1994), aff'd. 666 So.2d 73 (Ala. 1995).
 XV.
Smith contends that the trial court improperly instructed the jury because it did not incorporate his written requested instructions into its charge to the jury, and it further told the jury that these particular charges had been "requested by the parties." Specifically at issue is the following: *Page 169 
 "Now, ladies and gentlemen, in addition to what I've already said to you in this charge, I'm now going to read to you certain charges that have been prepared by the parties. These charges are correct statements of the law and are to be considered by you in connection with what's already been said to you in my charge about the law of this case."
(R. 1519.)
Smith contends that not only was the above in error, but also that the trial court exacerbated this error by telling the jury that it only had to "consider" the instructions, rather than to follow them. We will review this claim pursuant to the plain error rule. Rule 45A, Ala. R. App. P.
The trial court has broad discretion in fashioning its jury instruction. Clark v. State, 621 So.2d 309 (Ala.Cr.App. 1992). Furthermore, there is no requirement that the trial court incorporate any requested charges into its oral charge in any particular form. See Thompson v. State, 473 So.2d 1205
(Ala.Cr.App. 1985). Rather, the only requirement is that the trial court not inform the jury which party requested which charges. Rule 21.1, Ala. R. Crim. P. Here, the trial court did not reveal to the jury which party requested the charge, and we find no error.
We also find no merit in Smith's argument that the trial court erred in using the word "consider" instead of "follow" in its jury charge. The term "consider" was used throughout the trial court's oral charge, and is defined in Black's Law Dictionary 306 (6th ed. 1990) as to "fix the mind on, with a view to careful examination; to examine, to inspect. To deliberate about and ponder over. To entertain or give heed to." Clearly, the trial court's instructions to the jury to "consider" the charges was not plain error.
 XVI.
Smith contends that the prosecution committed numerous "foul blows" that he says deprived him of his constitutional rights, and that he was therefore denied a fair trial, due process, and a reliable sentence. We note that all but one of Smith's arguments will be reviewed pursuant to the plain error rule set forth in Rule 45A Ala. R. App. P., because only that one claim was properly raised at trial.
Statements made by attorneys during the course of a trial are not to be considered as evidence, and the jury was so instructed. Specifically, the trial court instructed the jury as follows:
 "In determining what the true facts are in the case ladies and gentlemen, you're limited to evidence that's been presented from the witness stand as opposed to matters that have been stated by the lawyers during the course of the trial. What the lawyers have said, both for the State and for the defendant, is not evidence in the case. What they've argued to you at various points in the trial is not evidence."
 "They have the right and the duty at the appropriate time in the trial to comment on the evidence and to draw reasonable inferences from the evidence as they argue their positions to you, but you should put what they say in a proper category in your thinking and like the indictment, that should not be in the evidence category."
(R. 1492; R. 1514.)
In reviewing these claims of improper prosecutorial comments, we must evaluate the comments in the context of the entire trial.Duren v. State, 590 So.2d 360 (Ala.Cr.App. 1990), aff'd,590 So.2d 369 (Ala. 1991). The question becomes "`whether the argument so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v.Wainwright, 477 U.S. at 182, 106 S.Ct. 2464, quoting Donnelly v.DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431
(1974). Further, we note that a prosecutor, in the closing argument, can state his or her interpretation of the applicable law. Burton v. State, 651 So.2d 641 (Ala.Cr.App. 1993), aff'd651 So.2d 659 (Ala. 1994), and can argue that the evidence presented at trial proves the guilt of the accused. Galloway v.State, 484 So.2d 1199 (Ala.Cr.App. 1986). Additionally, we point out that the control of a closing argument is in the broad discretion of the trial court. Thomas v. State, 601 So.2d 191
(Ala.Cr.App. 1992). That court is in the best position *Page 170 
to determine if counsel's argument and discussion is legitimate or if it degenerates into impropriety. Thomas, supra.
 A.
Smith contends that the prosecutor repeatedly vouched for the veracity of his witnesses and the strength of the state's case. Specifically, Smith contends that the prosecutor expressed his personal opinions during closing arguments. Smith argues that not only did the prosecutor comment on the facts of the case, he vouched for his witnesses' credibility. He contends that the state improperly bolstered Officer Mike Whitten's credibility and even indicated that Smith erred by attacking Officer Whitten's credibility.
We have reviewed the state's comments and arguments in the context of the entire trial and cannot say that plain error exists. The prosecutor has a right to present his impressions from the evidence and may argue every legitimate inference.Henderson v. State, 584 So.2d 841 (Ala.Cr.App. 1990), remandedon other grounds, 584 So.2d 862 (Ala.) affirmed on remand,587 So.2d 1071 (Ala.Cr.App. 1991). The prosecutor may "examine, collate, sift, and treat the evidence in his own way." Watson v.State, 398 So.2d 320, 328 (Ala.Cr.App. 1980).
Smith contends that during the guilt phase of the trial, the prosecutor argued inappropriate and irrelevant factors in order to inflame the jury. The alleged irrelevant statement made by the prosecutor is as follows:
 "And when he got him in the car with him, he carried him out Pleasant Grove, carried him down this road — And I have no doubt that at that point he was holding him at gun-point. Got him out, marched him down to the woods, took his money, and in cold blood killed him so that he couldn't be a witness against him and send him back to prison.
 "That's what happened in this case. I think your common sense tells you that's what happened in this case."
(R. 1472.)
As noted above, the prosecutor can make legitimate inferences from and can comments on the evidence. Henderson, supra. Furthermore, the prosecutor is permitted to argue that the evidence presented at trial proves that the accused is guilty.Galloway v. State, 484 So.2d 1199 (Ala.Cr.App. 1986). Therefore, we find no plain error.
 C.
Smith contends that the prosecutor improperly diminished the presumption that Smith was innocent by encouraging the jury to convict him because he had been accused of a crime. However, we find no merit in this contention. The prosecutor told the jury that "the State gladly accepted its burden of proof in this case . . . that is, that we should prove each and every element of the crime with which the defendant is charge beyond a reasonable doubt." (R. 1465.) The prosecutor then asked the jury to do something "that would be tough for anyone to have to do . . . that is, I'm asking you to sit in judgment of that man down there at the end of the table, Larry [Reynold] Smith. I'm asking you to sit in judgment of him because he stands accused of the most heinous, most brutal, cold, calculated crime that anyone could commit." (R. 1465-66.) Viewing this comment, along with the subsequent trial court instructions to the jury, we find no error. Galloway, supra; Haney v. State, 603 So.2d 368
(Ala.Cr.App. 1991).
Smith contends that the prosecutor, in both the guilt phase and the sentencing phase of the trial, misled the jury as to the applicable law, in effect lowering the state's burden of proving beyond a reasonable doubt every element of capital murder. We have reviewed Smith's claims and find no plain error. We cannot say that any of the state's comments or remarks misled the jury. Clearly, the evidence presented at trial is subject to legitimate comments by the prosecutor *Page 171 Taylor v. State, 666 So.2d 36 (Ala.Cr.App. 1994),aff'd 666 So.2d 73 (Ala. 1995)
 E.
Smith contends that the prosecutor argued for the application of nonstatutory aggravating circumstances in support of a death sentence in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and under Alabama law. We disagree. The state set forth the two statutory aggravating circumstances applicable to this case: 1) that the murder occurred during the course of robbery, 2) that Smith committed the offense under a sentence of imprisonment. The trial court properly instructed the jury concerning these two aggravating circumstances and specifically stated that the jury could not consider any aggravating circumstance other than these two on which they were instructed. Taylor, supra. There is no plain error here.
 F.
Smith contends that the prosecutor compared his rights to those of the victim in violation of the Fifth, Sixth, and Eighth and Fourteenth Amendments and Alabama law. Smith contends that this comparison inflamed the jury and encouraged it to base a verdict on passion and emotion. The comments, in pertinent part, are as follows:
 "So what kind of trial did Dennis Harris get? Dennis Harris didn't get a trial. He had a death warrant signed by the defendant, Larry Smith. It was signed in the mind of Larry Smith before he ever went out on this occasion to do this act. Premeditated; cold, to take a friend, a friend, and do this sort of thing.
". . . .
 "Think about it. When he pointed that pistol at Dennis Harris, what was going through the mind of Dennis Harris? I have no argument. Wait a minute. Let's talk about the mitigating factors here. Let's. . . .
 "[Defense Counsel]: Objection, Your Honor. He's putting the jury in the place of the — ah, of the victim and that's highly improper.
"The Court: Sustained
 "[Defense Counsel]: I ask that — the jury be given an instruction to disregard that —
 "The Court: Ladies and gentlemen, I instruct you to disregard that argument.
 "Is there any member of the jury that can't follow that instruction?
"The Court: Proceed, Counsel."
(R. 1592-93.)
A similar argument was presented in Gentry v. State,689 So.2d 894 (Ala.Cr.App. 1994), rev'd on other grounds, 689 So.2d 916
(Ala. 1996), and we held that the similar comments were not prejudicial. We also point that the jury here was specifically instructed to disregard any arbitrary factors such as passion, prejudice, or sympathy; and that jurors are presumed to follow the instructions given them. Taylor, supra. There is a prima facie presumption against error where the trial court immediately charges the jury to disregard improper remarks. Cole v. State,548 So.2d 1093, 1097 (Ala.Cr.App. 1989).
 G.
Smith contends that the prosecutor's closing argument at the sentence phase[2] implied that the jury had a duty to impose the death sentence. We disagree. The prosecutor simply requested that the jury recommend a death sentence based upon the law. Of course, a prosecutor seeking a death penalty will argue that the aggravating factors outweigh the mitigating facts and that the defendant should receive the death penalty. There is no plain error here. Henderson, supra.
 H.
Smith contends that the prosecutor improperly told the jury to "send a message to society by sending Smith to his death." We have reviewed the arguments of the prosecutor and cannot conclude that there was *Page 172 
error. The proseeutor's comments are not improper; there is simply no plain error. The prosecutor properly commented on the necessity of law enforcement as a deterrent to crime and as protection for society at large. See Kuenzel v. State,577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 581 So.2d 1179 (Ala. 1991).
 XVII.
Smith contends that the prosecutor "double counted" robbery both as an element of the capital offense and as an aggravating circumstance. However, the practice of using an element of the underlying crime as an aggravating circumstance is constitutionally permissible. Coral v. State, 628 So.2d 954
(Ala.Cr.App. 1992), aff'd, 628 So.2d 1004 (Ala. 1993). Therefore, we find no merit in Smith's argument.
 XVIII.
There is no merit in Smith's contention that execution by electrocution in Alabama is cruel and unusual punishment. Our most recent expression of the law in that area is found in Scottv. State, [Ms. CR-94-763, January 17, 1997], ___ So.2d ___ (Ala.Cr.App. 1997).
 XIX.
Smith contends that the evidence was insufficient to sustain a conviction of capital murder. He contends that he was arrested and convicted based upon information given to the police by Carl Cooper and that Cooper, because he was supposedly with Harris on the last day he was seen alive, had a vested interest in seeing someone convicted of the crime. Further, Smith contends that there is no physical evidence to link him with the crime, because no murder weapon was ever found, and because no wallet, money, jewelry, or other possessions of Harris's were ever found to support the robbery charge.
In determining the sufficiency of the evidence to sustain a conviction, this court has stated that it "`must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution'" White v. State,546 So.2d 1014, 1017 (Ala.Cr.App.), cert. denied, 546 So.2d 1014
(1989), quoting Faircloth v. State, 471 So.2d 485, 489
(Ala.Cr.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985).
 "`"The role of appellate courts is not to say what the facts are. Our role, . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury." An appellate court may interfere with the jury's verdict only where it reaches "a clear conclusion that the finding and judgment are wrong." "The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust." Even though an appellate court should "marvel that a jury would convict upon such flimsy proof," it is "not permitted to pass upon the weight or sufficiency of the evidence, where it may yield any rational inference of guilty." A verdict on conflicting evidence is conclusive on appeal. "[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense.'"
White v. State, 546 So.2d at 1017, quoting Granger v. State,473 So.2d 1137 at 1139, (Ala.Cr.App. 1985) (citations omitted).
Furthermore, "`[c]ircumstantial evidence alone can support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.'"White, 546 So.2d at 1017, quoting White v. State, 294 Ala. 265,314 So.2d 857 (Ala. 1975): Here, the evidence is sufficient to support the jury's guilty verdict.
 XX.
Smith contends that the trial court erred in refusing to grant his motion for a *Page 173 
mistrial, which was made in response to an alleged outburst in open court by Harris's mother. Specifically, Smith contends that on Saturday, when the jury rendered its guilty verdict, Harris's mother "broke down" and had to be helped out of the courtroom. However, Smith did not bring this alleged outburst to the court's attention until the following Monday. In fact, the record is devoid of any such outburst. Smith did not recall when the alleged outburst occurred, nor did the court or the state recall any such incident. The only recall of Harris's mother's emotional response to the verdict was the prosecutor's memory that "the victim's mother did shed some tears, she cried. It was very subdued." (R. 1541-44.) The court stated that it did not witness anyone "having hysterics, scream, hollering, jump up, or what-have-you." (R. 1544.) While the trial judge recalled that Smith and several members of his family shed tears after the verdict, he did not notice that "the victim's family made any outward display that I was aware of." (R. 1544.)
Generally, any misconduct or demonstration by a spectator during a criminal trial is not sufficient reason to grant a new trial, unless it appears that the rights of the accused were prejudiced. McNair v. State, 653 So.2d 320 (Ala.Cr.App. 1992). There must be a showing that the accused was prejudiced by the conduct. McNair, supra. There was no such showing here.
 XXI.
Pursuant to Rule 45A, Ala. R. App. P., we have searched the record for any plain error or defect in the proceedings against Smith. We have found no error to that either has or probably has adversely affected the substantial rights of Smith. Pursuant to § 13A-5-53(a), we have reviewed the propriety of the death sentence and have determined that no error adversely affecting any rights of Smith occurred at either the guilt or sentence phase of the proceedings.
The trial court found the existence of two aggravating circumstances: that the murder was committed during the commission of a robbery and that the murder was committed while Smith was under sentence of imprisonment. There was very little evidence of mitigating circumstances. Our independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence in this case. Our search of the record here reveals no suggestion that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Further, the death sentence here is not excessive or disproportionate to the penalties imposed in similar cases. Two-thirds of Alabama death sentences are imposed for a conviction of robbery murder. Kuenzel v. State, 577 So.2d 474
(Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied,502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
The judgment of the circuit court convicting Smith of capital murder and sentencing him to death is affirmed.
AFFIRMED.
All the Judges concur.
[1] Andy Whitten was murdered before the trial began. Mike Whitten was the only officer who questioned Smith who was available to testify.
[2] Although Smith's brief to this court refers to this argument as occurring during the guilt phase, it is obvious from the context that he is referring to the sentencing phase.